[No. 13603. In Bank. — March 26, 1891.]

## H. P. FULTON, RESPONDENT, v. E. H. BRANNAN ET AL., DEFENDANTS, AND E. J. CLARK, APPELLANT.

CONSTITUTIONAL LAW — STATE LANDS — POLICY OF STATE.— The policy of the state, as declared by sections 2 and 3 of article 17 of the state constitution, is against the holding of large tracts of land uncultivated, and against selling any lands suitable for cultivation in tracts in extent exceeding 320 acres, or to other than actual settlers.

ID. — CONSTRUCTION OF CONSTITUTION — LANDS SUITABLE FOR CULTIVATION. — The policy of the state should not be limited in its operation by a narrow construction of the constitution, but the effect should be rather to extend than to restrict. The phrase "lands belonging to this state which are suitable for cultivation," as used in section 3 of article 17 of the constitution, includes all of its lands which are ready for occupation, and which, by ordinary farming processes, are fit for agricultural purposes.

ID. — CLASSIFICATION OF LANDS TO BE SOLD — POWER OF COURTS. — The courts can make no other classification of lands belonging to the state for purposes of sale than that made by the constitution, as suitable or not suitable for cultivation.

ID. — QUESTION OF FACT. — Whether a particular tract of land is suitable or not suitable for cultivation is a question of fact.

ID. — SWAMP-LAND — SUITABLENESS FOR CULTIVATION. — All swamp-lands which at the time application was made for their purchase were fit for human habitation, and by ordinary farming processes can be made suitable for cultivation, can be sold only to actual settlers, and in quantities not exceeding 320 acres.

ID. — ESTOPPEL OF STATE — TEST OF SWAMP-LAND GRANT. — The state is not estopped from asserting that swamp-lands granted to it by the act of 1850 are fit for cultivation within the meaning of the state constitution, and is not bound to apply, as between herself and purchaser, the test found in the Arkansas act.

ID. — UNSUITABLENESS FOR CULTIVATION. — Swamp-lands are unsuitable for cultivation, within the meaning of section 3 of article 17 of the constitution, only where the lands cannot be made fit for cultivation; or where, although they can be so reclaimed, it cannot be done without the co-operation of others, unless by an expenditure greater than can reasonably be expected. from a settler upon a tract of 320 acres; or where the lands are not fit for human habitation until reclaimed.

APPEAL from a judgment of the Superior Court of Tulare County, and from an order denying a new trial.

The facts are stated in the opinion.

*Freeman & Bates,* for Appellant.

*Charles G. Lamberson, Suter & Snook, Davis & Allen,* and *E. O. Larkin,* for Respondent.

TEMPLE, C. — This is a contest for the purchase of land from the state, instituted in the land-office. The court awarded the land to plaintiff, and defendant appeals.

The land belongs to the class designated swamp-land, title to which was acquired by the state under act of Congress approved September 28, 1850. The plaintiff was an actual settler upon the land, and the defendant was not. Under the finding of the court, that the land in controversy was suitable for cultivation, this became the turning-point in the case, — the court holding that section 3, article 17, of the state constitution was applicable. Whether it applies to swamp-land at all, is the only question of importance in this appeal.

That the state has a clearly defined policy upon the subject generally is quite evident from the section in question and the preceding. They are as follows:—

"Sec. 2. The holding of large tracts of land, uncultivated and unimproved, by individuals or corporations, is against the public interest, and should be discouraged by all means not inconsistent with the rights of private property.

"Sec. 3. Lands belonging to this state, which are suitable for cultivation, shall be granted only to actual settlers, and in quantities not exceeding 320 acres to each settler, under such conditions as shall be prescribed by law."

The policy of the state is here declared to be against selling any lands suitable for cultivation in tracts in extent exceeding 320 acres, or to other than actual settlers. And this policy is greatly emphasized by the preceding section, which plainly declares that the holding of large tracts, uncultivated, is against the public

interests, and should be discouraged by all means consistent with private rights. In view of such declarations, it must be manifest that it was intended that all lands within this state should, so far as governmental action could accomplish it without violating private rights, be held in small tracts, and constitute homes for its owners. No narrow construction of the only words in the section open to construction — "suitable for cultivation" — should limit this policy. The effort should be rather to extend than to restrict, for the policy is plainly that the section should include all, so far as possible.

The constitution classifies all lands as suitable or not suitable for cultivation. For the purposes of this section, neither the legislature nor the courts can classify them otherwise, and it must follow that whether a particular tract belongs to one class or the other must always be a question of fact.

The courts cannot exclude any other class of lands from the effect of this limitation or prohibition, except lands in fact unsuitable for cultivation, nor can the courts declare any class, as a class, unsuitable for cultivation unless it knows judicially that no tract of the class in extent amounting to 320 acres is suitable for cultivation. Nothing less than this would justify such a judicial rule. Now, this court is presumed to know, what every intelligent man does know, that swamp-lands are liable to be reclaimed by natural causes, and that since the congressional swamp-land act, — called the Arkansas act, — many thousands of acres of these lands have been so reclaimed, and had been when the constitutional provision was adopted. There are now pending in this court several cases in which the court has found as a fact that the lands in question had been so reclaimed at the time of the several applications to purchase. These lands, when reclaimed, are often the most fertile we have, and entirely adapted to habitation.

Section 3 was construed in *Manley v. Cunningham*, 72

Cal. 236, "to provide that the public lands should be held and disposed of, so far as possible, to those who will live upon and cultivate them; that they should be used to encourage the immigration of industrious people, who will utilize and improve the lands, and by building up homes and engaging in husbandry add permanently to the wealth and prosperity of the state. The phrase 'suitable for cultivation' includes all lands ready for occupation, and which, by ordinary farming processes, are fit for agricultural purposes."

If this decision is to stand as expressive of the law of this state, all swamp-lands which, at the time application was made for their purchase, were fit for human habitation, and by ordinary farming processes can be made suitable for cultivation, can be sold only to actual settlers, and in quantities not exceeding 320 acres. ·

As already stated, the only language in section 3 which is open to interpretation is the phrase "suitable for cultivation." In *Manley* v. *Cunningham*, 72 Cal. 236, the phrase is construed, as a similar expression was by the Secretary of the Interior, in a letter of instruction to Commissioner McFarland: "All timber lands are unfit for cultivation in their natural condition, but if they may be reclaimed by ordinary farming process they are not, in my opinion, within the purposes of the act."

In this case it is found that the lands have already been reclaimed by natural causes, and the facts show that the land is as nearly fit for human habitation as wild, unimproved lands can well be.

It is claimed that the state is morally bound not to assert that these lands are suitable for cultivation, or perhaps is estopped from so doing because it received them under the Arkansas act, which only granted such lands as were "swamp and overflowed, and made unfit thereby for cultivation." Counsel says: "The duty of examining the public lands, and determining what parts thereof were swamp and overflowed, was confided to the

officers of the land department of the United States; and their decisions upon this subject, being the decision of a court of special jurisdiction made upon a subject unquestionably within the limits of that jurisdiction, is binding upon all persons, and conclusively establishes that the lands are of the class to which such officers have found them to belong. With respect to each tract of land now before this court, the proper officers have made due investigation, and have determined that it vested in the state under the statute of 1850. This determination was therefore a decision not only that it was 'made thereby unfit for cultivation,' for, under the statute, it was not granted to the state unless 'unfit for cultivation.' When the present constitution was formed and adopted, the state was entitled to various classes of lands, the chief of which were school and swamp lands. The lands of the first class were partly suitable for cultivation and partly not, but the lands of the latter class could not, unless obtained in defiance of law, be otherwise than 'unfit for cultivation.' "

That is, because the officers of the United States, in a proceeding to which the state was not a party and was not represented, acting under rules made by themselves, determined that on the 28th of September, 1850, these lands were swamp and overflowed, and therefore segregated them as such to the state, the state cannot be understood as intending to include them in this section, although every member of the convention knew as a fact that millions of acres had at that time been reclaimed by natural causes.

The test applied under the Arkansas act to determine whether lands passed to the state has always been their condition on the 28th of September, 1850. The very existence of such a test implies that it was well known that their condition as to being swamp and overflowed, and thereby rendered unsuitable for cultivation, was liable to change. The rulings of the land department

of the United States have recognized the fact that some of these lands have been in fact reclaimed, before the survey segregating them to the state. Commissioner McFarland said: " A survey made in California in February, 1880, as of all swamp-land where part had become dry from natural causes, it appearing that it was all swamp in 1850, was properly so designated on the survey." (Decisions Department Interior, pp. 312–320.)

And as stated above, the members of the convention, and the people when they adopted it, must be held to have known of such natural reclamation.

That some of these lands might be suitable for settlement was recognized by the statutes of the United States and of this state prior to the constitutional amendment. By act of Congress of March 5, 1855, provision was made for pre-emption or homestead locations upon these lands. As to the state, see sections 3442 and 3443 of the Political Code.

If one proposing to purchase from the state may be supposed to be concerned as to how the state shall discharge the obligation — if any — imposed upon it to reclaim these lands, such apprehension may well be set at rest by the fact that a fund has been provided, available for that purpose, made up of the proceeds of the sale of the lands, and by this very section 3, which aims to place them, so far as possible, in the hands of actual settlers, who must reclaim them as a means of getting a livelihood.

So far, the argument has proceeded upon the assumption that lands which are in fact swamp-lands, or subject to overflow so that they cannot be cultivated until reclaimed, are also to be considered unsuitable for cultivation within the meaning of section 3, now under consideration. But this proposition cannot be admitted. We see no reason why the rule laid down in *Manley* v. *Cunningham*, 72 Cal. 236, should not be universal in its application. The matter should be looked at from the

point of view of an intending settler.    If the land is of such character that such person is likely to be willing to settle upon it in its present condition, and to undertake its reclamation for the purposes of agriculture, and can do so successfully with such outlay as the circumstances would justify, it should be held to be suitable for cultivation within the meaning of this section.    The drainage of land so as to render it fit for the plow is an ordinary farming process, much more so than clearing land of timber, or grubbing up trees and brush.    The latter is mostly confined to new land.    The former is a perpetual subject of interest in agriculture.    Probably there are few farms in this state, thoroughly cultivated, some portion of which has not been drained.    And the drains must be constantly looked after.

The state is in no way bound to apply, as between herself and purchasers, the test found in the Arkansas act.    There it is used for a purpose altogether different, and evidently also with a very different meaning.    The primary purpose seems to have been to enable the state of Arkansas to control the margins of streams for the erection of levees.    The meaning of the phrase there used undoubtedly is, not suitable for cultivation until reclaimed.    It is not used in that general sense by which lands would be so classed by settlers, or by the land officers under another law making the fact of suitability material in the discharge of official duties.    This we have already shown.

All such laws, as well as the section of the constitution, must be understood as applying to wild, unimproved lands, which are known not to be fit for cultivation generally until something is done to reclaim them.    The section must be construed as intending this.    Are the lands suitable for cultivation in the sense in which portions of the unreclaimed public domain in its wild condition can generally be said to be suitable for cultivation?    The necessity for reclamation is taken for

granted in the constitution. The contrary doctrine would almost amount to a judicial repeal of the provision, and would sound strange before the policy, which declares that the holding of lands in large tracts, and without cultivation, is against the public interests, and stranger still in the face of the many cases already argued here, and now pending for decision, in which the lower court has found the fact of the suitability and present inhabitance.

The debates in the constitutional convention show that it was there understood that the provision in question would include swamp and overflowed lands, and that the lands mainly regarded as unsuitable for cultivation were grazing lands, which it was said must be held in larger tracts than three hundred and twenty acres, to be utilized profitably.

We can think at present of only three cases in which swamp-lands can be truly said to be unsuitable for cultivation within the meaning of this section: 1. Where the lands cannot be made fit for cultivation; 2. Where, although they can be so reclaimed, it cannot be done without the co-operation of others, unless by an expenditure greater than can reasonably be expected from a settler upon a tract of 320 acres; this would be a case for a reclamation district; and 3. Where the lands are not fit for human habitation until reclaimed. For of course it is necessary, in order to comply with this section, that the settlement be made before the purchaser can acquire any rights in the land.

We understand this conclusion to be in entire accord with the decision in *Manley* v. *Cunningham*, 72 Cal. 236.

It is claimed that this conclusion is at variance with the case of *McIntyre* v. *Sherwood*, 82 Cal. 139. The question was not presented there as here. There seems to have been no issue upon the subject in the court below, and it was not found as a fact that the land was suitable for cultivation. Probably it was not very fully argued,

but we do not care to draw nice distinctions. If there be anything in that really inconsistent with this opinion, it ought to be overruled.

We advise that the judgment and order be affirmed.

VANCLIEF, C., and FOOTE, C., concurred.

The COURT. — For the reasons given in the foregoing opinion, the judgment and order are affirmed.