[L. A. No. 1462. Department One.—January 17, 1906.]

# M. H. ROBINSON, Appellant, v. O. C. EBERHART et al., Respondents.

APPEAL FROM JUDGMENT—DISMISSAL.—An appeal from the judgment taken more than six months after its entry must be dismissed.

ID.—APPEAL FROM ORDER DENYING NEW TRIAL—REVIEW OF EVIDENCE.— Upon appeal from an order denying a new trial the insufficiency of the evidence to sustain the findings may be reviewed.

STATE LAND—SUITABLENESS FOR CULTIVATION—QUESTION OF FACT.—It is a question of fact whether state land applied for is suitable or unsuitable for cultivation within the meaning of section 3 of article VII of the constitution. If it is "suitable for cultivation," it can only be sold to actual settlers in quantities not exceeding three hundred and twenty acres to each settler. If "unsuitable for cultivation," a section may be granted to an applicant, who need not be a settler on the land applied for.

ID.—MEANING OF "SUITABLENESS"—ORDINARY FARMING.—The words "suitable for cultivation" contained in the constitutional provision have been construed by this court to include "all lands ready for occupation, and which by ordinary farm processes are fit for agricultural purposes."

ID.—POWER OF LEGISLATURE.—The constitution classes lands as suitable or unsuitable for cultivation; and it is not within the power of the legislature to limit the effect of the constitutional provision by prescribing requisites not contained therein.

ID.—DESERT LAND—UNSUITABLENESS FOR CULTIVATION—POSSIBILITY OF ARTESIAN WELLS.—Land in the Colorado and Salton Desert, which is situated ninety feet below the level of the sea, and which is generally known and designated as "desert land," which cannot be cultivated in any proper sense of the words "farming processes," is unsuitable for cultivation; and the possibility of the development of water by boring artesian wells in the future for artificial irrigation does not affect the unsuitableness of the land for cultivation within the meaning of the constitution.

APPEAL from a judgment of the Superior Court of River-side County and from an order denying a new trial. J. S. Noyes, Judge.

The facts are stated in the opinion of the court.

Collier & Carnahan, Washington & Carter, and Victor E. Shaw, for Appellant.

E. A. Meserve, E. E. Powers, C. F. Holland, Powers & Holland, and D. M. Hammack, for Respondents.

ANGELLOTTI, J.—This is an action instituted in the superior court of Riverside County, under an order of reference made by the surveyor-general, to determine the conflicting claims of plaintiff and defendant Eberhart, as to their respective rights to purchase from the state a half-section of state school land, the east half of section 36, township 6 south, range 7 east, San Bernardino base and meridian. Johnson has some claim under Eberhart, arising from a contract of sale. The judgment was in favor of defendant, and plaintiff appeals from the judgment and from an order denying his motion for a new trial.

The appeal from the judgment was taken more than six months after the entry thereof, and must therefore be dismissed. (Code Civ. Proc., sec. 939, subd. 1.) The point made by appellant against the judgment, insufficiency of evidence to sustain certain findings, is, however, available on the appeal from the order denying the motion for new trial. Eberhart's application to purchase was for the whole of said section 36, and was first in point of time. It was made upon the theory that the land was not "suitable for cultivation," his affidavit stating that it was not suitable for cultivation, and failing to show that he was an actual settler thereon, and the application being for six hundred and forty acres; and he in all respects complied with the law applicable to the sale of lands not suitable for cultivation. (Pol. Code, sec. 3495.) If the land was not "suitable for cultivation," within the meaning of those words as used in section 3 of article XVII of the constitution, which section provides that "Lands belonging to this state, which are suitable for cultivation, shall be granted only to actual settlers, and in quantities not exceeding three hundred

and twenty acres to each settler, under such conditions as shall be prescribed by law,'' it is conceded that Eberhart's application and showing were such as to entitle him to purchase the whole section. Section 3495 of the Political Code provides that ''Land unsuitable for cultivation may be sold in quantities not exceeding six hundred and forty acres to any one person, under the restriction other than as to actual settlement prescribed for the sale of cultivable lands.'' If, on the other hand, the land was ''suitable for cultivation'' within the meaning of the constitutional provision, the proceedings taken by him were ineffectual for any purpose. The finding of the trial court was that the whole of said section was, at the time of Eberhart's application, and ever since has been, land ''unsuitable for cultivation.'' If this conclusion of the trial court is sufficiently sustained by the evidence, it is conceded that the order denying a new trial cannot be disturbed.

The land in question is a portion of what is known as the ''Colorado and Salton Desert,'' and is generally known and designated as ''desert land.'' It is situated ninety feet below the level of the sea. It is conceded that the evidence conclusively shows that the land is not suitable for cultivation, save and except by artificial irrigation, the supply of water for which can only be obtained by means of artesian wells tapping water-bearing strata underlying the land at a depth varying from three hundred to five hundred feet. The average annual rainfall is so small as to be of no practical value for agricultural purposes. At the time of the making of Eberhart's application, there was no available water on said land or in the vicinity thereof, except such as might be obtained in the future by the boring of artesian wells. No experiments in that direction had then been made on this land, and whether or not sufficient water-bearing strata could be found thereunder to enable this land or any considerable portion of it to be successfully cultivated was necessarily uncertain. Without such a supply of water, it was clear to any one that the land was absolutely uncultivable. Even if water could be so obtained, much of the land was of such a character, owing to the presence in the soil of large quantities of alkali, that it was valueless for purposes of agriculture. Under these circumstances Eberhart made his application in the year 1900 to purchase this land as land not suitable for cultivation. The

most that he then knew of the possibility of obtaining water was that by artesian well-boring some water had been discovered in the vicinity, and that some attempts in the vicinity to thus obtain water had failed, and that if he could obtain a sufficient quantity by the same method, he might successfully cultivate portions of the land. He had one well bored at a cost of three hundred dollars, and at a depth of three hundred and forty feet found some water. Five other wells were subsequently bored, varying in depth from three hundred to six hundred feet, and four of these produced water. There was evidence to the effect that at the time of the trial, July, 1902, the wells were producing about twenty-one and one half inches of water, and there were two parcels of the section, aggregating twenty to twenty-four acres in area, situated in different legal subdivisions thereof, under cultivation. In no legal subdivision of the section was half of the acreage under cultivation. The wells produced not more than sufficient water to irrigate the land under cultivation. Other land, to the extent of about eighty-five acres, had been cleared and an attempt made to cultivate the same, but the attempts had been unsuccessful. Much of the land was found to contain alkali in such quantities as to make it valueless for agricultural purposes, even if sufficient water could be obtained. There was evidence to the effect that the flow of water from the wells had decreased to some extent, and whether or not additional water in any sufficient quantity could be obtained by the boring of other wells is a question that can only be answered after the boring of such wells.

It is apparent that this land was not suitable for cultivation, when tested by the requirements of section 3495 of the Political Code, which provides "that any smallest legal subdivision of school lands shall be deemed suitable for cultivation if any part not less than one half of its area will, without artificial irrigation, but with or without the clearing of timber or other growth therefrom, by the ordinary processes of tillage, produce ordinary agricultural crops in average quantity." It is, however, contended, and the contention appears to be fully supported by the decisions, that the legislature has no power to limit the effect of the constitutional provision by prescribing requisites not included therein. It is settled that no narrow construction of the only words in the constitutional provision

open to construction, "suitable for cultivation," should limit the general policy evidenced by the constitution that lands should be held in small tracts and constitute homes for the owners. It was said by this court in *Albert* v. *Hobler,* 111 Cal. 398, 400, [43 Pac. 1104, 1105] : "The constitution classifies all lands as suitable or not suitable for cultivation. For the purposes of this section, neither the legislature nor the courts can classify them otherwise, and it must follow that whether a particular tract belongs to the one class or the other must always be a question of fact." (See, also, *Jacobs* v. *Walker,* 90 Cal. 43, 48, [27 Pac. 48] ; *Fulton* v. *Brannan,* 88 Cal. 454, 456, [26 Pac. 506] ; *Manley* v. *Cunningham,* 72 Cal. 236, [13 Pac. 622].) The words "suitable for cultivation" contained in the constitutional provision have been construed by this court to include "all lands ready for occupation, and which by ordinary farming processes are fit for agricultural purposes." (*Manley* v. *Cunningham,* 72 Cal. 236, [13 Pac. 622] ; *Fulton* v. *Brannan,* 88 Cal. 454, [26 Pac. 506].) This, in view of the general policy of the state already referred to, appears to be a reasonable construction of the words used. It could never have been intended by the framers of the constitution to have included within the class of lands open in small subdivisions only to actual settlers, lands that may in the future be made available for successful cultivation only by an extensive system of reclamation, in which the co-operation of the owners of other lands is essential, or by some costly system of artificial irrigation, not ordinarily within the reach of the actual settler seeking to make a home on which he may reasonably expect to obtain a living.

If it be conceded that sufficient water could in the future be obtained on the land in question by artesian well-boring, which, if used in irrigating the same, would render any considerable part of it fit for agricultural purposes, and this the evidence utterly fails to show, the question would then remain as to whether the development of water in this way could be considered an ordinary farming process. We have no hesitation in answering this question in the negative. An attempt to so develop water has nothing whatever to do, like the clearing land of timber, or even surface water, with the preparation of the soil for agricultural purposes. It is in no proper sense of the word "farming." It is more in the nature of a specu-

lative and very costly effort to discover an element which when discovered, and by artificial methods combined with the soil, will render it amenable to ordinary farming processes. The question as to whether water in sufficient quantities will be found several hundred feet below the surface of any particular land, and, if found, whether the supply will continue, must always be more or less uncertain of determination, and especially uncertain in land of the character of, and situated as, the land in controversy. However liberally the words "ordinary farming processes" may be construed, we are satisfied that they cannot be held to include such a method for the development of water.

There is no analogy between this case and that of *Fulton* v. *Brannan*, 88 Cal. 454, [26 Pac. 506], strongly relied on by plaintiff. The question in that case was whether land which had been ceded to this state as swamp land could under any circumstances be held to be land "suitable for cultivation" within the meaning of our constitutional provision. It was found that the land there in question had already been reclaimed by natural causes, and by ordinary farming processes could be made suitable for cultivation, and that it was therefore, as matter of fact, land "suitable for cultivation" within the meaning of the constitution, and could be disposed of only as therein provided. It was further declared in the opinion, in effect, that the mere drainage of land, so as to render it fit for the plow, where the same could be accomplished without the co-operation of others, and without an expenditure greater than could reasonably be expected from a settler upon a tract of three hundred and twenty acres, was an ordinary farming process, just as was the clearing the land of timber (*Manley* v. *Cunningham*, 72 Cal. 236, [13 Pac. 622], *Jacobs* v. *Walker*, 90 Cal. 43, [27 Pac. 48]), or the grubbing up of trees and brush. We have no disposition to question the correctness of this statement. There is, however, a clear distinction between the removal from the surface of the land of things interfering with the cultivation thereof, such as timber, brush, and water, and the attempted development by artesian well-boring of a sufficient supply of water with which to irrigate land absolutely unfit for agricultural purposes unless artificial irrigation can be had. The former is well recognized as an ordinary incident of the work of the farmer, and the effect of the pro-

posed work can be foreseen with certainty.  As was said in *Fulton* v. *Brannan,* 88 Cal. 454, [26 Pac. 506], ''Probably there are few farms in this state thoroughly cultivated some portion of which has not been drained.  And the drains must be constantly looked after.''  The latter is simply a speculative attempt involving a very considerable expenditure to obtain an element essential to render the land at all suitable for cultivation.

We are satisfied that land absolutely unfit for cultivation, unless by the boring of artesian wells water may in the future be developed in such quantities as to render it possible to artificially irrigate the same, is land not suitable for cultivation within the meaning of our constitutional provision.  This was the situation as to the land in controversy at the time that Eberhart made his application to purchase and went upon the land and commenced to improve it.

Our conclusion upon this question makes it unnecessary to consider any other question presented.

The appeal from the judgment is dismissed, and the order denying a new trial is affirmed.

Shaw, J., and McFarland, J., concurred.