THE HON. WILLIAM L. HOLLOWAY,
THE HON. JOHN HURLY,
THE HON. JOHN A. MATTHEWS,
THE HON. CHARLES H. COOPER, } Associate Justices.

---

STATE EX REL. LYMAN, RELATOR, *v.* STEWART, GOVERNOR, ET AL., RESPONDENTS.

(No. 4,577.)

(Submitted March 8, 1920. Decided May 8, 1920.)

[190 Pac. 129.]

*States — Powers—Public Indebtedness—Terminal Grain Elevators—Statutes—Constitution—Taxation.*

States—Constitution—Power to Engage in Business of Operating Grain Elevators.
1. It not being prohibited from doing so by the Constitution, the state may, under its police power, lawfully engage in the business of operating a grain elevator or in other similar business for the benefit of the public.

Same—Statutes—Terminal Grain Elevators — Constitution — Uniformity Clause.
2. *Held,* that Chapter 150, Laws of 1919, requiring a levy of a tax upon lands "agricultural in character" for the purpose of bond issues for the construction of terminal elevators, does not violate the uniformity clause of the Constitution.

58 Mont.—1  (1)

Same—Taxation—Lands "Agricultural in Character"—Definition.
     3.  *Held,* that the words "agricultural in character" as used in section 4, Chapter 150, Laws of 1919, referring to lands subject to taxation for the purpose of creating the "terminal elevator fund," are sufficiently definite and certain to enable assessing officers in determining what lands they shall list, the term meaning lands susceptible of being plowed and seeded or from which crops may be produced.

Statutes and Statutory Construction—Definition of Words.
     4.  Where words have, in the law, a well-defined meaning, their use in a statute, without specific definition, does not render the Act inoperative for uncertainty.

States—Creating State Debt—Taxation—Constitution.
     5.  Chapter 150, Laws of 1919, section 4, though needing revision, *held* not so defective as to render it unconstitutional under section 2, Article XIII, of the Constitution, which declares that when a state debt is created, provision shall be made for the levy of a tax for payment of the principal and interest.

Statutes—Constitutionality—Rule for Determining.
     6.  The constitutionality of a statute will be upheld unless it appears beyond a reasonable doubt that the Act is unconstitutional.

Statute and Statutory Construction—Surplusage.
     7.  Words in a statute which can be given no effect consistent with the plain intent of the statute, or words which, if given effect, may defeat the manifest purpose of the Act, should be eliminated or regarded as surplusage.

Terminal Elevator Statute—Tax Levy—Sufficiency—Legislative Question
     8.  Whether a tax levy provided by the legislature for the erection and maintenance of state owned terminal grain elevators is sufficient to meet the obligation of the state is a legislative question with which the court has nothing to do, and, in the absence of a showing of insufficiency, it will be presumed to be ample.

Original application for injunction by the State, on relation of E. F. Lyman, against Samuel V. Stewart, Governor, and others constituting the State Board of Examiners.    Dismissed.

*Messrs. Pray & Callaway,* for Relator, submitted a brief; *Mr. Lew L. Callaway* argued the cause orally.

*Mr. S. C. Ford,* Attorney General, and *Mr. Frank Woody,* Assistant Attorney General, for Respondents, submitted a brief; *Mr. Woody* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

This is an original application for an injunction to restrain the respondent board of examiners from issuing and selling on behalf of the state bonds to the amount of $250,000 in excess

of the constitutional limit and over and above any bonded in-
debtedness heretofore incurred by the state, authorized by
Chapter 150 of the Laws of the Fifteenth Legislative Assembly,
supplemented by Chapter 204 of the Laws of the Sixteenth
Legislative Assembly, to procure funds for purchasing or build-
ing a terminal grain elevator, with the necessary equipment, at
Great Falls, Montana, to be controlled and operated by the
state and used for the storage and marketing of grain pur-
chased in Montana. Chapter 150 in terms provides for the
submission to the qualified electors of the state, at the following
general election, of the question of the issuance of such bonds.
So far as pertinent here, the following is an epitome of its pro-
visions:

Section 1 authorizes the state board of examiners to issue
bonds in the name of the state of Montana to the amount of
$250,000 for the purpose above specified.

Section 2 provides that the bonds shall be issued in denom-
inations of $1,000 each, that they shall become due in ten years
from the date of their issuance, redeemable and payable, how-
ever, at the option of the state at any time after five years
from the date thereof at any interest paying period, and that
they shall bear interest at a rate of not to exceed five per cent
per annum, payable semi-annually on June and December 15
of each year, at the office of the state treasurer.

Section 4 provides: "The state board of examiners shall make
a charge of not more than two and one-half (2½) cents per
bushel for grain stored in the terminal elevator and the money
so received after paying the expense of maintaining the ter-
minal elevator shall be paid into the state treasury and cred-
ited to a separate fund designated as the 'Terminal Elevator
Fund,' and said fund shall be used exclusively for the payment
of the interest and redemption of such terminal elevator bonds
herein provided for. If the money so paid into the 'Terminal
Elevator Fund' is not sufficient to pay the semi-annual interest
on the bonds and the redemption thereof, then and in that
event there shall be levied annually not exceeding one-half

(½) of a mill on the dollar on all lands, agricultural in character, which said tax when collected by the county treasurer shall be accounted for and paid over to the state treasurer to be by the state treasurer held in the 'Terminal Elevator Fund,' which fund shall be used exclusively for the payment of the interest on such bonds and for the redemption thereof."

Section 5 directs that the county assessors of the several counties of Montana, commencing with the year in which the bonds are issued and continuing so long as such bonds, or any part of them, or any interest thereon, shall remain unpaid, shall designate upon the assessment-roll the lands subject to the tax.

Chapter 204 above (Laws 1919, p. 486), provides for the appointment of a board of managers for the elevator, prescribing their powers and duties, and providing for the location, construction, maintenance and operation of the elevator, and for the issuance of bonds by the state board of examiners under the authority conferred by the people by their vote under Chapter 150 at the general election in November, 1918. Section 5 is as follows: "Upon completion of such study and investigation and having decided upon a workable plan for the construction and successful operation of said terminal elevator and within sixty days after its organization, the board of managers shall notify the state board of examiners that it is ready to proceed with the construction of said terminal grain elevator. The said board of examiners of the state of Montana is hereby authorized and directed to proceed with the issuance and sale of bonds of the state of Montana to the amount of two hundred and fifty thousand ($250,000) dollars for the purpose of constructing said terminal grain elevator with the necessary equipment at Great Falls, Montana, pursuant to the provisions of Chapter 150 of the Session Laws of the Fifteenth Legislative Assembly of the state of Montana, and the vote of the electors at the general election in November, 1918."

Section 10 directs that the money received from the storing and handling of grain, after the payment of the expense of maintaining and operating the elevator, including the salary

of the superintendent and expense of the board of managers and premiums on the bonds, shall be paid into the state treasury to the credit of the "Terminal Elevator Fund," and that this fund shall be used exclusively for the payment of the interest and principal of the elevator bonds.

On January 29 of this year the board, assuming to act under the provisions of Chapters 150 and 204, advertised the bonds for sale. On February 28 this action was brought to enjoin the issuance and sale of the bonds on the ground that the legislation referred to is unconstitutional. The attorney general interposed a general demurrer to the complaint. The controversy was thereupon submitted for final decision upon the questions of law thus raised.

1. It is not questioned by counsel for relator that the state [1] may lawfully engage in the business of operating a grain elevator or in other similar business for the benefit of the public, as distinguished from private business. Indeed, it could not be questioned, for the reason that there is no provision of the Constitution which prohibits it. In the absence of such provision, the legislature is left free to establish, and to provide by law for the conduct of, such a business so long as the plan adopted by it does not impinge upon some other provision or limitation in the Constitution or some one of the powers delegated by the people to the federal government. It is held that the state may establish such institutions under its police power. (*State ex rel. Lyon* v. *McCown,* 92 S. C. 81, 75 S. E. 393; *Rippe* v. *Becker,* 56 Minn. 100, 22 L. R. A. 857, 57 N. W. 331.) Indeed, it is settled law in this jurisdiction that, subject to these limitations, the legislature possesses all the power of law-making which inheres in any independent sovereignty. (*State ex rel. Sam Toi* v. *French,* 17 Mont. 54, 30 L. R. A. 415, 41 Pac. 1078; *In re Pomeroy,* 51 Mont. 119, 151 Pac. 333; *State ex rel. Hillis* v. *Sullivan,* 48 Mont. 320, 137 Pac. 392; *Hilger* v. *Moore,* 56 Mont. 146, 182 Pac. 477.)

Section 1 of Article X of the Constitution declares that "educational, reformatory and penal institutions, and those for the benefit of the insane, blind, deaf and mute, soldiers' home, and such other institutions as the public good may require, shall be established and supported by the state in such a manner as may be prescribed by law." This language is broad enough in its scope to include any sort of an institution which the legislature in its discretion may determine the public good requires. Therefore, whether the authority of the legislature to establish and provide for the support of any public institution by the state is to be found in this clause of the Constitution or in its general police power, there can be no doubt that it exists.

2. It is suggested, though not seriously urged, that the [2] provision requiring the levy of the tax provided for on "lands agricultural in character" violates the uniformity provision of the Constitution. This question is, we believe, disposed of in this jurisdiction by the opinion in the case of *Cunningham* v. *Northwestern Improvement Co.,* 44 Mont. 180, 119 Pac. 554, and in *Hill* v. *Rae,* 52 Mont. 378, Ann. Cas. 1917E, 210, L. R. A. 1917A, 495, 158 Pac. 826. In the first case noted this court said: "The state may classify persons and objects for the purpose of legislation, provided the classification is based upon justifiable distinctions, and for a purpose within the legislative power." In the second: "It does not follow, however, that the object in respect to which the classification is made must commend itself to 'certain preconceived and deeply rooted notions of lawyers' (*Cunningham* v. *Northwestern Improvement Co., supra*), or that the classification must always depend 'on scientific or marked differences in things or persons or relations; it suffices if it is practical, and it is not reviewable unless palpably arbitrary.' "

There being a logical reason for assessing "lands agricultural in character" for the support of an institution which will directly benefit only the owners of such lands, the legislature

was acting within its constitutional power when it made the classification.

3. The next question presented is: Are the words "agricultural in character" sufficiently definite and certain to enable [3] the assessing officers of the state to determine what particular lands shall be listed for taxation? Relator insists that they are not, for the reason that the phrase used is not defined in the Act, "nor was there any Act, when Chapter 150 was passed, defining 'agricultural lands' throughout the state, to our recollection." Even if such were the case, we do not apprehend that it would be an unsurmountable difficulty, for "that is certain which can be made certain" (Rev. Codes, sec. [4] 6206), and if the term has, in the law, well-defined meaning, its use, without specific definition, would not render the Act inoperative for uncertainty.

Chapter 147 of the Laws of 1909 makes a specific classification of state lands, general throughout the state, which section was in effect at the time of the passage of the section in question, and which is based on a classification contained in our Constitution, to-wit: "Said lands shall be classified by the board of land commissioners, as follows: First, lands which are valuable only for grazing purposes. Second, those which are principally valuable for the timber that is on them. Third, agricultural lands. Fourth, lands within the limits of any town or city or within three miles of such limits." (Sec. 1, Art. XVII, Constitution of Montana.) Here the term "agricultural lands," which is synonymous with the term "lands agricultural in character," includes all lands of the state neither included within the limits of a town or city nor within three miles of such limits, lands valuable only for grazing purposes, and lands principally valuable for the timber on them, and, except for the special exclusion of lands which may be agricultural in character, lying within the three-mile limit of cities and towns, which has no application here, might well be taken as a guide for the classification under this Act.

The word "agricultural" is defined as pertaining to, connected with or engaged in agriculture. (Century Dictionary.) "The term 'agriculture' has been defined to be the 'art or science of cultivating the ground, especially in fields or large quantities, including the preparation of the soil, planting the seeds, the raising and harvesting the crops and the rearing, feeding, and management of livestock; tillage, husbandry, and farming.' " (2 Corpus Juris, 988, note b.) "It is equivalent to husbandry, and 'husbandry,' Webster defines to be the business of a farmer, comprehending agriculture or tillage of the ground, the raising, managing, or fattening of cattle and other domestic animals, the management of the dairy and whatever the land produces. * * * But in a more common and appropriate sense it is used to signify that species of cultivation which is intended to raise grain and other field crops for man and beast." (*Simons* v. *Lovell,* 7 Heisk. (Tenn.) 510–516.) A phrase having much the same meaning, under the California statutes, is "suitable for cultivation." This phrase was construed in the case of *Robinson* v. *Eberhart,* 148 Cal. 495, 83 Pac. 452, to include all land which, by ordinary farming methods, is fit for agricultural purposes.

It will be seen that the term "agricultural lands," or lands "agricultural in character," may be used in a broad or in a restricted sense, depending upon the intention of the legislature in the use of the term, and that the legislative intent expressed in the Act under consideration was that, as the Act was passed for the benefit of those owning lands susceptible of being plowed and seeded, or from which crops may be produced, under section 5 of Chapter 150, the assessing officers should list those lands within their jurisdiction, and only those, of the character indicated. Many tracts of land not now used for the purpose of raising grain are "susceptible" of being used for such purpose; hay lands and pasture lands, other than those "valuable only for grazing purposes," may produce crops.

Conceding the above to be the intention of the legislature, and following the constitutional and statutory provisions in

effect at the time of the passage of the Act, there should be no
great difficulty experienced by the assessing officers, and no
confusion as between the several counties of the state, and all
lands listed as being subject to the tax in one county should,
therefore, correspond to like assessment in each of the other
counties.

4. It is next urged that the provisions of section 4 of the
[5] Chapter, heretofore set out in full, do not meet the re-
quirements of the Constitution as to the levying of taxes for
the payment of the interest and the extinguishment of the debt
within the specified time. It is contended that the means pro-
vided are inadequate, in that the section provides for the levy-
ing of a tax only in the event the receipts from the terminal
elevator are not sufficient, after deducting running expenses,
to meet the interest and provide the proper amount to be placed
in the sinking fund.

Section 2 of Article XIII of the Constitution provides, in so
far as applicable here, that "such law shall specify the pur-
pose to which the funds so raised shall be applied and provide
for the levy of a tax sufficient to pay the interest on, and extin-
guish the principal of such debt within the time limited by
such law for the payment thereof."

Counsel cites a number of cases involving statutes creating
a state debt without providing for the levying of such a tax,
and where the court held the law to be unconstitutional. With-
out question, such a statute would be void under the above
provision of our Constitution. But in Chapter 150, section 4
does provide for the levying of a tax for the purpose desig-
nated. Disregarding for the moment the provision for the
payment of interest, *etc.*, from net proceeds of the terminal
elevator, the phrase, "There shall be levied annually," *etc.*, is
the phrase commonly employed in acts which do "provide for
the levy of a tax," under the constitutional provision quoted,
and, standing alone in this section, in conjunction with the
provisions of section 5, which provides that "the county as-
sessors of the counties in Montana, commencing with the year

wherein the bonds herein provided for may be issued and continuing so long as such bonds * * * may remain unpaid shall designate upon the assessment-rolls the lands subject to the tax in the foregoing section, provided for,'' and which makes no provision for a withholding on the part of the assessors until it shall be ascertained whether the net proceeds of the plant will take care of the matter, would give ample authority for saying that the legislature did "provide for" the tax and provide the power to make the assessment thereunder and to collect the tax on the lands subject thereto. Section 4 is, it is true, loosely drawn, and, to be effective, requires revision. The legislature should have first provided for the levy of the tax and then provided a method by which, if in any one year after the year in which the bonds are issued the net earnings in the terminal elevator fund shall be sufficient to meet the demands, the tax should not be collected for that year.

The rule is well settled in this jurisdiction that the court [6] will sustain the constitutionality of a law, unless it appears beyond a reasonable doubt to be unconstitutional. (*In re O'Brien*, 29 Mont. 530, 1 Ann. Cas. 373, 75 Pac. 196; *Northwestern Mut. Life Ins. Co.* v. *Lewis and Clark County*, 28 Mont. 484, 98 Am. St. Rep. 572, 72 Pac. 982; *State* v. *Camp Sing*, 18 Mont. 128, 56 Am. St. Rep. 551, 32 L. R. A. 635, 44 Pac. 516; *Missouri River Power Co.* v. *Steele*, 32 Mont. 433, 80 Pac. 1093; *Spratt* v. *Helena P. & T. Co.*, 37 Mont. 60, 94 Pac. 631.) Under the head "Considerations Calling for Construction," the author on the subject, in 25 R. C. L., page 959, says: "If the statute under consideration appears to be in conflict with a provision of the Constitution, state or federal, there is an ambiguity; for it is always presumed that the legislature did not intend to violate either Constitution; it is always presumed it intended its enactments to become valid and enforceable laws. * * * Another occasion for construing a statute is where uncertainty as to its meaning arises not alone from ambiguity of the language employed, but from the fact that giving a literal interpretation of the words will lead to such unreason-

able, unjust, or absurd consequences as to compel a conviction that they could not have been intended by the legislature"—citing cases. Again, on page 868 of the same work, we find the rule that "the reason of the law, as intended by its general terms, should prevail over its letter, when the plain purpose of the Act will be defeated by strict adherence to its verbiage." And in section 225, page 974, it is stated that "courts cannot by construction supply *casus omissus* by giving force and effect to the language of the statute when applied to a subject about which nothing whatever is said, and which, to all appearances was not in the minds of the legislature at the time of the enactment of the law." But, while the court cannot add to or supply words or phrases to give to the statute some supposed intention of the legislature, "when words occur in a statute which [7] can be given no effect consistent with the plain intent of the statute, they must be rejected as without meaning. And words or phrases which, if given effect, might defeat the manifest purpose of the statute, will be eliminated or regarded as surplusage."

It must be presumed that the legislature intended to do its duty. That duty in the instant case was to provide for a levy of taxes to meet the interest and discharge the debt within the time provided. Clearly it did not intend that there should be a hiatus when these obligations would not be met, and we think, therefore, that from the loosely worded provisions of section 4 we can presume that the legislature intended, under any circumstances, that these obligations be met as they fall due, and, by following the rules of construction laid down, eliminate those provisions which would render the section uncertain, and, if sufficient remain to provide for the meeting of these obligations as they fall due, we can uphold the law in its modified form, though we cannot interpolate words into the statute.

Following these suggestions, we have the provision that "There shall be levied annually not exceeding one-half (½) of a mill on the dollar on all lands, agricultural in character, which said tax when collected by the county treasurer shall be

accounted for and paid over to the state treasurer to be by the state treasurer held in the 'Terminal Elevator Fund,' which fund shall be used exclusively for the payment of the interest on such bonds and for the redemption thereof.'' Section 5: ''That the county assessors of the counties in Montana, commencing with the year wherein the bonds herein provided for may be issued and continuing so long as such bonds shall or any part thereof or any interest thereon may remain unpaid shall designate upon the assessment-rolls the lands subject to the tax in the foregoing section, provided for.'' And we have also the provision that the net proceeds from the elevator shall also be held in such ''terminal elevator fund'' for a like purpose, and that the provision for meeting these obligations out of the net proceeds of the elevator may be disregarded until such a time as the legislature may make suitable provision for the payment of the interest on the bonds and the discharge of the principal debt out of the surplus, if any there be, in said fund.

Whether the levy of one-half mill on the dollar is sufficient [8] to meet the obligation is a legislative question with which the court has nothing to do. (*State* v. *Holland,* 37 Mont. 393, 96 Pac. 719.) No showing is made that it will not be sufficient, and for the purposes of this hearing it must be presumed that it will be ample.

Other questions are raised in the complaint filed as to the constitutionality of the Act, but were conceded in argument to be without merit, and are therefore not considered.

In our judgment, the Act is not open to attack on the grounds urged, and the demurrer is therefore sustained, and the proceedings dismissed.

*Dismissed.*

ASSOCIATE JUSTICES HOLLOWAY, HURLY and COOPER concur.

MR. CHIEF JUSTICE BRANTLY, being absent, takes no part in the foregoing decision.