[Civ. No. 746. Fourth Appellate District.—March 18, 1932.]

NIS HANSEN et al., Respondents, v. J. A. D'ARTENAY et al., Appellants.

Clark Clement and E. W. Holland for Appellants.

M. L. Short and John F. Pryor for Respondents.

MARKS, J.—This is an action to quiet title. It was filed by respondents on June 20, 1929. Appellants asserted and defended upon the grounds of an interest in and the right to the possession of the property in question under a contract of purchase and sale made with respondents. The trial court held that appellants had forfeited their rights under the contract by a breach of its conditions and gave judgment for respondents.

A former action had been instituted by respondents against appellants on October 25, 1927, in which they sought to quiet title to the property in question and relied upon breaches of this same contract which had occurred prior to that date. Judgment in that case went against respondents upon the same questions that are presented in the instant case, so we need only concern ourselves with alleged breaches of the terms of the contract which occurred after October 25, 1927.

On September 1, 1922, respondents were the owners of 800 acres of land in the Tulare Lake bottoms of Kings County, California, together with 320 shares of stock in the Gates-Jones ditch. They executed a contract of sale of this property whereby they agreed to sell and appellants agreed to buy it for $104,000, payable $14,000, part in cash and part by a note secured by a chattel mortgage, and the balance with interest by the delivery to respondents each year of one-half of the crops or the gross selling price thereof. A supplementary contract was executed, the terms of which are not material here.

In the instant case the judgment in the trial court is based upon the failure of appellants to irrigate the growing grain during the cropping seasons of 1927–1928 and 1928–1929, which failure resulted in its drying up and failing to mature; and also upon their failure to pay to respondents one-half of $200 which had been received for sheep pasturage on the property for 1928 and $800 received for the same purpose in 1929.

In the first action the trial court found that the appellants had paid respondents "on account of said agreement the aggregate sum of $51,485.32". Respondents now urge that under the terms of their contract they were required to make certain advancements to appellants and to pay certain taxes and assessments for them, and that these sums, together with interest which has accrued, leave the amount unpaid on the purchase price at practically the same sum which was owing at the time of the execution of the contract. While this may be true, it does not of itself furnish any ground for a forfeiture of the contract or of the rights of appellants to continue the purchase of the property. If the respondents desired to have the purchase price paid within a given time they should have so specified in the contract. They did not do so and the courts cannot rewrite the instrument for them.

The contract contains the following covenants: "The balance of said purchase price, and interest thereon, to be paid by the delivery of one-half (½) of the gross value of the crop raised upon said premises each year, . . . The said buyer, . . . agrees to pay said sellers . . . the sum of one hundred four thousand ($104,000.) Dollars, at the times and in the manner herein provided, . . . interest and prin-

cipal to be payable from the crop as more particularly herein set out. . . . The buyer agrees to plow and cultivate, in a good and farmerlike manner, all of said lands during each and every year, beginning with the crop year of 1923, and to so continue until the purchase price hereinbefore mentioned, together with interest on deferred payments and any payments made by the sellers as herein provided, have been paid in full; and to seed as much of said lands each year as is consistent with good farming methods. When the grain grown upon the aforementioned premises is ready to be harvested, said buyer covenants and agrees to commence harvesting, and continue with due diligence the harvesting of said crop, and to at a proper time and in a proper manner, deliver the same for sale or storage, at his discretion. That if he shall sell said grain, he shall immediately deliver to the sellers one-half (½) of the gross proceeds received therefrom, as herein provided; and that if he shall decide to store said grain, he shall immediately deliver to said sellers warehouse receipts for one-half of all grain grown upon said premises, said warehouse receipts to be properly assigned to said sellers so as to transfer title in said grain to said sellers. It being understood and agreed that the said grain so held by said sellers shall be held subject to be sold at the request of the buyer, the money obtained therefrom to apply on this agreement, after deducting from said money so obtained any warehouse charges or costs incurred by said sellers in the storing or handling of said grain; it being understood and agreed that said grain shall not under any circumstances be stored more than one year. The buyer covenants and agrees that he will at all proper times keep the grain fully insured, and should the grain be destroyed by fire, or otherwise, any money obtained from insurance or otherwise, shall be paid one-half (½) thereof to the sellers, and credited herein as provided. It is mutually understood and agreed that the money obtained from the sale of said grain, or the insurance thereof, shall be applied, first, on the payment of any taxes or assessments previously paid by the seller, as herein provided; secondly, to the payment of interest due under this agreement; the balance remaining thereafter to apply on the purchase price, as herein agreed. . . . Failure on the part of the buyer to comply with any of the provisions or conditions of this agreement,

by reason of . . . the elements, acts of God, . . . floods, . . . or by any cause beyond the control of the buyer, whether similar to the causes herein specified, or not, shall not be deemed a failure by the buyer to comply with any of the provisions of this agreement, or a violation of any of the provisions of this agreement. . . . Should default be made in the payment of any sum or sums which said buyer hereinbefore covenants and agrees to pay when the same become due, or should default be made by said buyers in not seeding, cultivating or harvesting the crops upon said lands, as hereinbefore provided, in a good farmerlike manner, or in failing to comply with any of the covenants and agreements hereinafter to be performed by said buyer, then in such event the whole unpaid balance of said purchase price with interest, and all advancements theretofore made by said seller, with interest thereon, shall be immediately due and payable at the option of said sellers, who may thereupon at their option enforce their rights hereunder, either by forfeiture of all rights of said buyer under this agreement and all interest in the land described herein and the appurtenances as herein provided, . . . '' The contract provided that time be its essence.

We will first consider the question of whether or not the failure to irrigate the growing crops of grain in each of the years, 1928 and 1929, furnished respondents a ground for forfeiture of the contract. This involves the consideration of two questions: First, because of the total failure of the existing water supply in dry seasons, were appellants required by the contract to develop new sources of supply of irrigating water; and, second, was irrigation excused by the contract when the existing water supply failed because of drought?

Circumstances surrounding the parties executing a contract, and well known to them at the time, are often of great assistance in interpreting their intention where the express terms of the contract are not clear and where a dispute later arises. ''A court is not only to take a contract by all its corners, but is to be placed in the seats of the parties when it was made. In other words, a contract is to be construed in the light and with the knowledge of surrounding circumstances.'' (6 Cal. Jur. 294; Civ. Code, sec. 1647; Code Civ. Proc., sec. 1860; *Stein* v. *Archibald,*

151 Cal. 220 [90 Pac. 536]; *Peterson* v. *Wagner*, 52 Cal. App. 1 [198 Pac. 25].) As the contract is void of any terms placing an obligation on either of the parties to develop a new or additional water supply in the event of a failure of the existing water supply, we may look to the surrounding circumstances to determine their intention upon the happening of that unhappy event.

We are informed that during the early period of California's statehood Tulare Lake was a considerable body of water and was of sufficient depth to permit the navigation of flatbottom steamboats. It was fed by the melting snows of the mountains and at times drained northward, its waters finally reaching the ocean. As the San Joaquin Valley became populated and its lands cultivated, much of the water which formerly fed the lake was diverted by agriculturists for irrigation purposes. This, with recurring periods of subnormal rains and mountain snows, so reduced the waters of the lake that, intermittently, and for several successive years at a time, it has been entirely dry and much of its old bed has been at times cultivated. For the last number of years, during the periods when there was water in its bed, its size as a lake has been greatly reduced. Farmers of the district built a series of dikes to restrain the spreading of the water during the "wet years", so that a large portion of the former lake bottom was reclaimed and permanently used as agricultural lands. The water confined in the lake furnished an important supply of irrigating water for the district.

The land in controversy was located about one and one-half miles from the boundaries of the lake as defined by the dikes. In the development of an irrigation project the farmers of the neighborhood had constructed the Gates-Jones ditch, which passed by the boundaries of respondents' property. The 320 shares of stock which we have mentioned entitled the parties here to take irrigating water from this ditch. Its bottom was about level with the bottom of the lake, and in the summer of 1922 the water in it stood at about, or slightly above, the level of the adjacent land. When the water was above the land, gravity flow carried it on to the fields. When it receded below this level it was necessary to pump the water on to the lands.

Respondents had a well upon their property, with a pump operated by electrical energy. The plant cost about $10,000. A number of years ago the well flowed, but the water-level had so receded in the summer of 1922 that the pumps and equipment could only raise sufficient water to irrigate three or four acres of land each day. It is therefore obvious that the water in the Gates-Jones ditch furnished the only adequate supply of water for irrigation purposes on September 1, 1922, the date of the contract of sale. At that time, by using the pumping plant alone, it would have taken at least 200 days to irrigate the 800 acres of land to be cultivated under the terms of the contract. It is apparent from the relatively small number of acres of land that could be irrigated with water from the well during the comparatively short irrigating reason in maturing a crop of grain, that the pumping plant furnished a small auxiliary to the main supply of irrigating water obtained from Tulare Lake through the Gates-Jones ditch. That it was so regarded by the parties is indicated from the failure of the contract to require appellants to maintain the pumping plant so that it would pump water to its capacity of that time, or to enlarge it and install other and larger or deeper pumping equipment, or to provide other sources of well water for irrigating purposes. The silence of the contract on these questions might be strongly urged as indicating that as there was a considerable quantity of water in Tulare Lake in 1922, the parties regarded that source of supply adequate for irrigation purposes until such time as respondents would receive their pay in full for the property.

Shortly after appellants went into possession of the property a series of "dry years" set in. The water in Tulare Lake began to recede and the water-levels in all the wells in the district fell. Appellants twice lowered the pump in the well and later installed a pump of different capacity from the one which was there in September, 1922. The mechanical construction of the well would not permit the pump to be further lowered without much reconstruction work.

In the fall of 1927 appellants planted the entire property to crops of grain which ordinarily would have matured in 1928. In 1927 the water-level receded to between 120 and 130 feet below the surface of the ground, entirely below

the reach of the pumping equipment, so that no water could be raised to the surface during 1928. Tulare Lake entirely dried up, and appellants were without any water for irrigation purposes. The crops failed to mature in 1928 solely because of a lack of irrigation. The same condition existed in 1929 and the same crop failure resulted. It is conceded that the planting was done in a good and farmerlike manner, and it is admitted that in these two years the crops were only fit for pasturage and were not suitable for harvest.

As we have indicated, appellants sold the pasturage for $200 in 1928 and $800 in 1929, retaining these sums of money. On May 28, 1929, respondents demanded that appellants pay them $500, one-half the money received for the pasturage. It was not paid, and this action was instituted on June 20, 1929.

Appellants maintain that their covenants to "plow and cultivate in a good and farmerlike manner all of said lands" or the provision for forfeiture upon their failure in "cultivating . . . the crops upon said lands . . . in a good and farmerlike manner" should not be construed to include the irrigation of the crops. It is admitted that grain cannot be grown upon the property without irrigation and that this was well known to both parties at the time of the execution of the contract. We think the construction of this language sought by appellants is not justified by the intention of the parties as disclosed from the entire instrument and the well-known conditions governing the farming of grain in the district. We conclude that the provision requiring appellants to cultivate the crops upon the lands in a good and farmerlike manner required them to perform all acts of good husbandry necessary to successfully mature the crops within the means reasonable within their command, if not prevented by means over which they have no control, or excused by other terms of the contract. As the crops could not be matured without irrigation, good husbandry would require their irrigation if water were therefor reasonably available under ordinary conditions.

As the contract did not require appellants to develop new or additional supplies of water for irrigation purposes, and did not contain a specific requirement that appellants irrigate the crops each season, we cannot hold that the provision requiring them to cultivate the crops in a good

and farmerlike manner would compel them to drill additional wells or develop other sources of supply should the water ordinarily used for irrigation purposes entirely fail by reason of long or continued droughts. The development of an additional supply of water would not be included within the duties imposed by their obligation to cultivate the crops in a good and farmerlike manner. Whether or not the development of irrigating water by drilling wells was included as one of the incidents of ''farming'' was considered in the case of *Robinson* v. *Eberhart*, 148 Cal. 495 [83 Pac. 452, 454], where it was said: ''If it be conceded that sufficient water could in the future be obtained on the land in question by artesian well-boring, which, if used in irrigating the same, would render any considerable part of it fit for agricultural purposes, and this the evidence utterly fails to show, the question would then remain as to whether the development of water in this way could be considered an ordinary farming process. We have no hesitation in answering this question in the negative. An attempt to so develop water has nothing whatever to do, like the clearing land of timber, or even surface water, with the preparation of the soil for agricultural purposes. It is in no proper sense of the word 'farming'. It is more in the nature of a speculative and very costly effort to discover an element which, when discovered, and by artificial methods combined with the soil, will render it amenable to ordinary farming processes. . . . However liberally the words 'ordinary farming processes' may be construed, we are satisfied that they cannot be held to include such a method for the development of water.''

We conclude that by the terms of the contract the failure of appellants to irrigate the crops and thereby mature them so that respondents would have received payments on their contract during the years of 1928 and 1929 was expressly excused by that clause which provided that where any breach was caused by ''the elements, acts of God, . . . or by any cause beyond the control of the buyer'', that such breach should not be considered ''a violation of any of the provisions of this agreement''. The failure of the implied obligation to irrigate the crops was caused by a total failure of the supply of irrigating water and should be held to come within these provisions. Certainly, if the

crops had been washed out or destroyed during these two years by great and unusual floods, their loss would be excused. We cannot see why such loss should not be excused when the converse was true and they were destroyed by drought. In reaching this conclusion we are aided by the principle announced in 6 Cal. Jur. 362, as follows: "A forfeiture stipulated in a contract will be enforced if the rights of the parties cannot otherwise be preserved. But a contract is not to be construed to provide a forfeiture unless no other interpretation is reasonably possible. The law does not favor forfeitures, and will not enforce them in the absence of clearly stated conditions of forfeiture. As provided by the Civil Code, 'A condition involving a forfeiture must be strictly interpreted against a party for whose benefit it is created.'" (Sec. 1442, Civ. Code.)

█ The only other purported breach of the contract by appellants upon which a forfeiture might be predicated is their failure to pay respondents one-half of the moneys received from the sale of sheep pasturage during the two years in question. We should again observe that the contract is devoid of any *express* provisions regarding the ownership of the returns from such source. In its entirety it would appear that at the time of the execution of the contract the parties had in view the division of the proceeds from the matured crops, from which source alone respondents would receive payment for their property. The trial court found: "It is true that there is no custom as to the division of stubble on lands in the neighborhood of the lands described in plaintiffs' complaint herein.

In considering this question we have access to the interpretation put upon the terms of the contract by the conduct of the parties from its execution in 1922 to its attempted forfeiture in 1929. █ Where a contract between parties has been interpreted by their actions over a period of years, and the express terms of the contract are not to the contrary and their meaning not clear, the construction so placed upon its terms forms a very reliable means of arriving at their true intentions. (*Ghirardelli & Co.* v. *Students' Express & Transfer Co.*, 175 Cal. 427 [166 Pac. 16]; *Woodard* v. *Glenwood Lumber Co.*, 171 Cal. 513 [153 Pac. 951]; *Boardman Co.* v. *Petch*, 186 Cal. 476 [199 Pac. 1047].)

Each year, from the execution of the contract to its attempted forfeiture sheep pasturage was grown on the property. Up to the year 1928 it consisted of stubble, and in 1928 and 1929 it consisted of unmatured and dried crops planted by appellants which were not fit to be sold for any other purpose. The stubble had been sold by appellants for sheep pasturage and all of the proceeds from such sales retained by them with the knowledge of respondents and without their demanding any part thereof. The dried crops were also so sold by appellants in 1928 and the sale price retained by them. This sale was made some time before the middle of 1928 and was known to respondents, who did not demand any part of the proceeds of the sale until the latter part of May, 1929, and after the sale of the sun-baked crops of 1929. We believe this course of conduct between the parties, extending without interruption and by mutual consent over a period of six consecutive years, shows rather conclusively that they construed the contract in such a manner as to give appellants the right to retain the money received from the sale of sheep feed. This conclusion is supported by a careful study of the contract, which in its entirety would support the conclusion that only matured crops or money derived from their sale should be divided between the parties and furnish a fund to which alone the respondents must look for their payments under its terms.

We have reached the conclusion that the two purported breaches of the contract relied upon by the trial court to support the judgment forfeiting appellants' rights under the contract are entirely insufficient to accomplish any such result.

Judgment reversed.

Barnard, P. J., and Jennings, J., concurred.