STATE OF IOWA ex rel. JOHN FLETCHER, Attorney-general, et al., Appellants, v. EXECUTIVE COUNCIL OF STATE OF IOWA et al., Appellees.

924

March 5, 1929.

*John Fletcher*, Attorney-general, and *Neill Garrett* and *Earl F. Wisdom*, Assistant Attorney-generals, for appellants.

*Stipp, Perry, Bannister & Starzinger* and *Senneff, Bliss, Witwer & Senneff*, for appellees.

EVANS, J.—I. The procedure adopted herein cannot be approved. As presented, the case carries some of the aspects of a moot one. The legislative call upon the attorney-general to test the constitutionality of the act, by action brought by himself, overlooked the limitations upon the power of the judiciary, and quite ignored the legitimate scope of the powers of the attorney-general. By the very nature of his office, and by statute, he is the legal adviser, both of the executive council and of the general assembly. To require him to maintain this action is to put him in a position which is repugnant to his other official duties. Nor has the judiciary of this state any power to render a merely declaratory judgment. We have jurisdiction to entertain only justiciable causes, prosecuted by a bona-fide litigant whose private rights are alleged to be invaded by an unconstitutional act. We recognize the fact that the legislative call was an act of deference to the judiciary, as a co-ordinate department of the state; and in turn, such deference is hereby fully reciprocated by the judicial department. The legislative good faith is manifest; and likewise that of the attorney-general, who has performed the mandate upon him with sincere purpose and with signal ability. Nevertheless, judicial duty requires us to say that he has no legal standing as a plaintiff in this case; and this we do without implying criticism upon him or upon the legislative body. We shall, therefore, treat the case as being maintained by Chrisinger, as sole plaintiff, who, as a resident of the state and owner of taxable real estate therein, and the owner of an automobile, and the payer of a license fee thereon, and the purchaser of much gasoline therefor, challenges the constitutionality of the act.

II. The act under challenge has, as its objective, the creation of a debt by the state of Iowa for $100,000,000 and the issuance of bonds therefor. Under the Constitution, the legislature has no power to create a state debt greater than $250,000, except by certain procedure set forth in the Constitution, which comprises the submission of the question to a vote of the electorate. The constitutional procedure is contained mainly in Article VII of the Constitution, and more particularly in Section 5 thereof. Section 5, Article VII, is as follows:

: ''Sec. 5. Except the debts hereinbefore specified in this article, no debt shall be hereafter contracted by, or on behalf of this state, unless such debt shall be authorized by some law for some single work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax, sufficient to pay the interest on such debt, as it falls due, and also to pay and discharge the principal of such debt, within twenty years from the time of the contracting thereof; but no such law shall take effect until at a general election it shall have been submitted to the people, and have received a majority of all the votes cast for and against it at such election; and all money raised by authority of such law, shall be applied only to the specific object therein stated, or to the payment of the debt created thereby; and such law shall be published in at least one newspaper in each county, if one is published therein, throughout the state, for three months preceding the election at which it is submitted to the people.''

Pursuant to the foregoing, the act in question was passed by the legislature and adopted by vote of the electorate at the last general election. This act purported to provide for a bond issue of $100,000,000 and to create an indebtedness of the state to such amount by the sale of such bonds. The alleged purpose of the act is to provide means for the construction of a system of primary roads within and throughout the state, comprising a paving mileage of approximately 5,000 miles. Purported provision is made in the act for the levy of a direct tax for the payment of the bonds, as they mature, as required by Section 5, subject, however, to certain contingencies therein specified. In addition to its provision for a direct tax for the payment of the bonds, the act also provides for the budgeting of the primary

road fund in such a way that the bonds shall in fact be paid out of such primary road fund, rather than by means of the direct tax. The primary road fund is created and replenished by the collection of indirect taxes, such as motor license fees and gasoline taxes of three cents per gallon, and by Federal aid appropriations. These resources amount, at the present time, to approximately $15,000,000 a year. The act as a whole is something more than a provision for borrowing money and issuing bonds therefor, and of levying a direct tax for the redemption of the bonds. In addition to such direct purpose, it comprises a considerable and detailed scheme or plan of financing. The objective of this financing plan is to so conserve and direct these future resources of the primary road fund, comprising gasoline taxes and motor license fees, that they shall be available and sufficient to pay the bond issue as fast as the bonds mature, and thereby to render the collection of a direct tax wholly unnecessary. The details of this financing plan constitute the legal morass in which the bond issue has become entangled. This finance plan is based upon estimates and probabilities, and appears plausible and sound, as distinguished from the question of its legality under the Constitution. The necessary result of this plan, if valid and successful, is that no direct tax will ever be levied, and that the accumulations in the primary road fund from the sources indicated will be abundant to redeem all bonds as they mature, with a substantial margin left over. The plan further contemplates the retirement of county bonds in like manner. It appears that authorized road bonds have been issued in 61 counties, to an amount of $43,000,000, outstanding. The plan contemplates the retirement of these county bonds, either by a payment thereof out of the primary road fund, or by substitution therefor of state bonds to a like amount. The sum of $100,000,000 is to include the sum total of all bonds, both county and state. The whole enterprise is to be financed by one scheme. The period of time covered by the enterprise is divided into two parts. The first part is the construction period, and comprises the first six years. At the expiration of this period, the improvement will have been finished, and the proceeds of the bond issue will have been expended. The second part is the period of redemption of bonds. This runs from 1935 to 1954, inclusive. Under the proposed plan, the last bond will be redeemed in 1954,

and all redemptions will have been made by the appropriation of gasoline taxes and motor license fees. These resources are budgeted to the following purposes: (1) To the maintenance of primary roads; (2) to the payment of interest on all outstanding county bonds and to the payment of principal on all maturing county bonds; (3) to the use of the highway commission in carrying out the provisions of the act. It is enacted also that this budget provision shall not be amended or repealed by any future legislature. Certain provisions of the act will be set forth later herein. With this general outline, we proceed to a consideration of specific complaints.

III. It will be noted that Section 5, Article VII, provides:

"And such law shall impose and provide for the collection of a direct annual tax, sufficient to pay the interest on such debt, as it falls due, and also to pay and discharge the principal of such debt, *within twenty years from the time of the contracting thereof.*"

The period of time covering the successive sales and maturities of the bonds provided for in this act extends from 1929 to 1954. Complaint is directed to this feature of the act, as being in violation of Section 5, in that it fails to provide for the discharge of the debt within the time limit of 20 years. The response to this complaint is that immediate sale of the entire bond issue is not contemplated; that the same will be sold in installments or series on successive dates, as the proceeds of the bonds shall be needed for road improvements. These successive dates of sale will cover a period of 6 years. The last installment of the bonds will be offered for sale in 1934. It is proposed to sell only sufficient bonds, from time to time, to meet the progressive needs of present construction. The period of construction comprises 6 years. The period of expenditure of the proceeds of the bonds will be likewise 6 years. For instance, it is proposed to sell only $17,000,000 worth of bonds in the year 1929. $17,000,000 will meet the expenses of construction for that year. By the sale of such bonds, the debt will be created to that extent only. For the next year, other bonds will be sold, to the amount of $17,000,000. The resulting proceeds will meet the expenditure for that year. This process will be carried through the 6-year construction

period. The bonds proposed are known as "serial bonds." This means that the bonds are negotiated in series, on successive dates. The term denotes a comparatively modern method of financing large enterprises. The objective of the method is to avoid the large waste involved in borrowing large sums of money long before they are needed for expenditure. Each bond offered for sale is to mature within 20 years from the date of its negotiation. The average maturity period of all the bonds from the date of their contracting is less than 20 years. Such is the general plan of maturity which is proposed. Its practical merit and its economic wisdom may be conceded. But this does not open a way of escape from the specific requirement of the Constitution. This requires that the debt shall be paid "within 20 years from the time of contracting thereof." When does such 20-year period begin? That depends upon when and how the debt is created. The debt is necessarily created by the sale of the authorized bonds. Every purchaser of a bond becomes a lender of a part of the debt. The whole debt need not be created at the same time. Bonds may be sold upon deferred dates, and these may cover a period of years. Every deferred sale of bonds is pursuant to a creation of the debt. At what point of time, therefore, shall the debt be deemed to have been created? Shall such point of time be at the beginning of the creation of the debt, or at the close thereof? The reason for this constitutional provision is quite apparent upon its face, and is well known historically. These reasons have been set forth by us to some extent in *Grout v. Kendall,* 195 Iowa 467. A cardinal purpose of the framers of the Constitution was that a debt, once contracted, shall be paid within and by the generation that voted it. This purpose is disclosed in the "debates" that attended the adoption of the Constitution, as we shall presently indicate. There was a proposal in the constitutional convention to adopt a period of 35 years. It was opposed on the ground that the period was longer than that of an average generation. The shorter period was adopted. If we should now say that a debt may be authorized and thereafter incurred in installments extending over a period of 6 years, and that the 20-year period of limitation shall not begin to run until the expiration of such 6 years, then we have escaped the literal boundaries set by the Constitution, and have suffered no restraint whatever therefrom. True, the difference

between 20 years and 25 years is not great. Even the larger period may be deemed within the time of a generation. But when we get outside of the limits set by the Constitution, no limitation is left. If the period of maturity of the debt, as a whole, may be extended merely by extending the time of creating installments of the debt, then we have destroyed the adequacy of the provision to the purpose of its adoption. The deferred installments in the creation of the debt could be extended over a period of 20 years, or even more, as lawfully as over a period of 6 years. Manifestly, therefore, to defer the running of the 20-year period of limitation by deferring creation of installments of the debt becomes an evasion of the Constitution, rather than an observance of it. The following excerpt, which we quote from the "Debates" of the Iowa Constitutional Convention (1844-46), page 48, has its interest and significance:

"Mr. Lucas said that was an important provision of the bill that required the legislature to provide ways and means for the payment of any liabilities that might be created. It would let the people see how the debt was to be paid. He was opposed to making the term of a debt 35 years, as provided in the report of the committee. It was more than a generation, and he was opposed to creating a debt for posterity to pay. 19 years was about the lifetime of a majority. The existence of a debt should be limited to 20 years."

We deem it clear that the intent of the framers of the Constitution was that the period of 20 years should cover the beginning and the ending of the "*debt*," and that such intent is clearly expressed in Section 5 of Article VII. We hold, therefore, that the 20-year period must be deemed to begin with the beginning of the debt. It follows that the act under consideration is unconstitutional at this point.

IV. Sections 13 and 15 of the act under consideration are as follows:

"Sec. 13. While Section 15 hereof is in effect, the laws of the state relating to motor vehicle license fees and the gasoline license fees accredited to the primary road fund, shall not be amended so as to reduce the funds now arising therefrom, and the said proceeds of such license fees shall not be used for any other purpose than as specified in this act.

• ''Sec. 15. The provisions of the seven preceding sections shall remain in force and effect without amendment, which will in any way affect the rights and security of the holders of any such bonds, so long as any thereof shall be outstanding, except that this section shall cease to be effective after the expiration of ninety days after all of said bonds have been legally called for payment.''

The purport of the foregoing is to pledge irrevocably the fund arising from gasoline taxes and motor vehicle licenses to the payment of the bonds. The plaintiff challenges the validity of these sections. The act as a whole is one for the creation of an indebtedness in excess of $250,000. The power of the legislature to create it is circumscribed by the limitations of the Constitution. Within the limitations of the Constitution, and pursuant to its procedure, the forty-second general assembly had power to create the debt and to render its enactment thereof irrevocable by any future general assembly. It had the constitutional power to impose a ''*direct* tax'' for the payment of the debt it had created. No future general assembly could repeal the levy of such tax while the debt remained. But this is so because the Constitution makes it so. In the absence of any constitutional provision to such effect, no general assembly has power to render its enactment irrevocable and unrepealable by a future general assembly. No general assembly can guarantee the span of life of its legislation beyond the period of its biennium. The power and responsibility of legislation are always upon the existing general assembly. One general assembly may not lay its mandate upon a future one. Only the Constitution can do that. It speaks as an oracle, and stands as a monitor over every general assembly. The funds resulting from license fees and gasoline taxes are within the legislative power, and are necessarily subject to the control of the existing general assembly. Its enactment in relation thereto will continue in force until repealed. The power of a subsequent general assembly either to acquiesce or to repeal is always existent. It must be held, therefore, that Sections 13 and 15, above quoted, were and are wholly ineffective and void.

The same pledge here considered is contained also in Sec-

tions 8, 9, and 10 of the act. To such extent, therefore, these sections are also ineffective and void.

V. Section 12 of the act is as follows:

"Sec. 12. In each year after this act becomes effective and until all of the bonds issued hereunder shall have been retired, there is hereby imposed and levied upon all the taxable property within the state of Iowa, in addition to all other taxes, to be included and added to the tax levied for state purposes, *a direct annual tax for such amount as shall be necessary and sufficient, together with the amount available for that purpose from the primary road fund,* to pay the interest and principal of all bonds issued under the provisions of this act, as and when the same accrues and becomes due. The proceeds of such direct annual tax are hereby appropriated for the payment of interest and principal of bonds issued hereunder and when collected by the treasurer of state shall be credited to the primary road bond redemption fund.

"The treasurer of state shall annually certify to the executive council, prior to the time for the levy of general state taxes, the amount of money required to be raised to pay the principal of and interest on bonds issued under this act and maturing in the ensuing year, and said executive council shall annually fix the rate of tax necessary to be levied and assessed upon the valuation of the taxable property within the state to produce funds sufficient to pay such principal and interest, and such additional annual direct tax shall be levied, certified, assessed, and collected at the same time and in the same manner as are taxes for general state purposes; *provided, however, that if money from the primary road fund has been appropriated and is set apart for the same purpose for which said direct annual tax is hereby levied and imposed, then the treasurer of state, in annually certifying to the executive council the amount required, shall specify the amount of money from the primary road fund so appropriated, and the rate fixed by the executive council shall make proper allowance and reduction for any such money so appropriated and set apart from the primary road fund."*

The foregoing purports to be responsive to the requirement of the Constitution for the levy of a "direct tax." This

section is challenged by the plaintiff in that it fails to "impose" a tax, and fails to "distinctly state the tax,"  all as required by Article VII. It is first to be noted that this section does not provide the millage of taxation. It is contended for the defendants that the millage rate is a mere matter of computation; that all the factors are made to appear in the legislation, from which the computation can be made; that such computation is purely clerical or administrative. If it be correct that all the factors of the computation are disclosed, then it is doubtless true that the matter of computation is quite clerical. In *Grout v. Kendall*, 195 Iowa 467 (page 475), a bond issue for the payment of a soldiers' bonus was involved. The enactment of the legislature was submitted to a vote of the electorate, as here. That provision of the enactment which purported to impose a direct tax, as required by Article VII, omitted the specification of any millage rate. We held it to be a sufficient compliance with the requirements of the Constitution, although that particular omission was not pressed upon our attention. We pass, therefore, to the consideration of the question whether the correct factors of the computation are present.

This section consists of two parts,—a fore and a hinder part. It is manifestly important that these shall travel together. They are not wholly consistent. The first part affirms, and the latter part retracts. The one declares a direct tax, and the other suspends it by *proviso*. Even the first part is qualified, as indicated by our italics above. The proviso incorporates into the act the same alternative or substitute which we have considered in our foregoing Division IV, as a part of Sections 13 and 15 of the act. We hold this proviso, as it appears in Sections 13 and 15, as ineffective and void. For the same reason, it must be held ineffective and void in Section 12. It is incorporated here as one of the correct factors in the computation. It is not a correct factor, and therefore the clerical character of the computation for the rate of millage fails.

The net result of Section 12, like that of Sections 13 and 15, is that it pledges the license and gasoline taxes to a primary liability for the payment of the debt. This is a purported substitution of these indirect taxes for the direct tax. Thereby the section becomes doubly invalid, because the legislature had power

neither to *pledge* nor to *substitute* an indirect tax for a direct one.

VI. Inasmuch as we hold that Sections 13 and 15 and the corresponding provisions in Sections 8, 9, 10, and 12 are void, it remains to consider the effect of such holding on the enactment as a whole. Can these void provisions be eliminated without impairing the validity of the act in other respects? It is argued that, inasmuch as a tax was imposed in the first part of Section 12, then security to the bondholding lender is thereby provided, and he is in no manner affected by the invalidity of the other provisions. This contention overlooks the fact that the bondholding lender is not the only party in interest in the lending contract and in the procedure leading up to the issue and sale of the bond. The Constitution withholds from the legislature the power to create this debt except with the approval of a majority vote of the electorate. The initiative is with the general assembly. It has full power to formulate the proposed enactment. When it is submitted in final form to the voter, he has no power to qualify or amend. His vote must be aye or nay. The act upon its face advises him that a debt is being created. Presumably he considers not only the restraints against the creation of a debt, but also the inducements to an affirmative vote. The Constitution requires that he be warned that the debt created must be paid by "direct tax." By this enactment he was advised that gas taxes and license fees for 20 years were primarily pledged to the payment of these bonds. Under the estimates, the sum total of these resources so pledged would amount to $140,000,000. He was assured thereby that no "direct tax" should ever be collected from him. Inasmuch as we hold that the inducing pledge was void, for want of power in the general assembly to make it, this withholds from the voting taxpayer the compensation which induced him to approve. It is quite established in this state that, if the provision held to be unconstitutional is of such character as to form one of the compensating parts of the statute, its rejection will vitiate the whole statute. In *City of Dubuque v. C. D. & M. R. Co.*, 47 Iowa 196, 216, we said:

"It is claimed that this section is compensation or inducement for the remainder of the statute, and that, this section

being held unconstitutional, the whole act is void. It has been held to be a sound construction of a statute that, when one section thereof is void, and others valid, yet, if it evidently appears that one section is a compensation or inducement for another, and the connection between them is such as to warrant the belief that the valid part would not have been passed alone, then the whole should be held void. *Slauson v. Racine,* 13 Wis. 398, and other cases cited by appellee.''

See, also, *State v. Santee,* 111 Iowa 1.

We think it quite apparent that the incorporation in the act of Sections 13 and 15 necessarily operated as a substantial inducement to an affirmative vote, and that their invalidity becomes destructive of the entire act. And this is so quite independently of Section 14 of the act, which we proceed to notice.

VII. Section 14 provides as follows:

''Sec. 14. *. * * Should the Supreme Court of Iowa hold that the use of primary road funds, derived from motor vehicle license fees and gasoline license fees.for payment of principal and interest of state bonds as provided in this act.is unconstitutional then this whole act shall be held invalid .and no bonds shall be issued hereunder.''

It should be noted here that we are not holding that the *use* of primary road funds derived from motor vehicle licenses and gasoline taxes, for whatever purpose, is unconstitutional. Such question is not before us. We hold only that the *pledging* of these resources for a future period, to the exclusion of later legislative control, is beyond the power of the particular general assembly. These funds are at all times subject to legislative control by the existing general assembly. Any general assembly may, by legislation, devote these existing funds to the construction and maintenance of roads, or may divert them, and such legislation may continue in force until amended or repealed by a later general .assembly. In the present case, it may be that the existing legislation on that subject will so commend itself to future assemblies that its continuation will be assured for an indefinite period of time. The practical result may be quite the same as though the present general assembly had the power to pledge and to exclude future general assemblies from the right to amend or repeal. The fact remains that the Constitution

confers upon the legislature no mortgaging power over future resources, other than the proceeds of a *direct* tax.

The defendants cite us to the following three authorities on the question involved at this point: *Allen v. Cromwell,* 203 Ky. 836 (263 S. W. 356) ; *State ex rel. Lyman v. Stewart,* 58 Mont. 1 (190 Pac. 129) ; *Wilkins v. City of Waynesboro,* 116 Ga. 359 (42 S. E. 767). It will be noted that these come from Kentucky, Montana, and Georgia, and involve provisions of the Constitutions of those respective states. The requirement of our Constitution for the imposing of a "direct tax" is not contained in any of the Constitutions under consideration in the cited cases. In that respect, our Constitution has but one precedent, so far as counsel have been able to discover by careful research. That precedent was the Constitution of New York, as it was prior to 1915, on which date that Constitution was amended. While that Constitution was in effect, its requirement for a "direct tax" was held to be mandatory, and not subject to qualification or condition, or substitution of other resources. *People ex rel. Hopkins v. Board of Supervisors,* 52 N. Y. 556.

VIII. The foregoing comprises the principal grounds of challenge to which argument has been directed. As to other grounds, we shall content ourselves with announcing our conclusions, without elaboration or discussion.

(1) It is contended that, under Section 1, Article VII, the state is forbidden to assume, or become responsible for, the debts or liabilities of any individual or corporation, and that,  therefore, the state may not use any of its primary road fund for the payment of road bonds issued by counties. The argument is that a county is a corporation, and comes under the inhibition of Section 1. We think that the county is not within the contemplation of such Section 1. True, the county is a corporate entity, but it is made such by statute only. Its incorporation is a part of the legal organization of the state, as such. It is a component part of the state. The state has full legislative power over every highway therein, regardless of the county wherein it lies. The county sustains no other relation to a highway than as a component part of the state. It has no proprietary right therein. Nor has the state any proprietary

right therein, other than the sovereignty which it exercises over every part of its domain. The beneficial proprietor of the highway is the general public. The maintenance and construction of highways is for the use of the public. The function of officials therein is to serve the public. The relation of the county to the highways is subordinate to that of the state. No reason is apparent to us why the state may not at any time exert its power over the construction and maintenance of the highways to the exclusion of the county, if such be the legislative will.

(2) The appellant assails the validity of the act under consideration as being a special law, in violation of Section 30 of Article III of the Constitution.

This act describes in detail the whole highway system which it is proposed to construct. This construction is the *object* specified as a reason for creating the proposed debt. Section 30 provides:

"Sec. 30. The general assembly shall not pass local or special laws in the following cases: * * * For laying out, opening, and working roads or highways;"

We think this section is necessarily confined in its operation to ordinary legislation. This act to create a debt in excess of $250,000 is necessarily special legislation. The Constitution requires that the particular *object* for the creation of the debt be specified. Even so, the general assembly is not empowered to create such debt by ordinary enactment, but is required to submit the same to a vote of the electorate. We hold, therefore, that Section 30 can apply only to ordinary legislation, enacted by the legislature without reference to the electorate and without the restrictions imposed upon it in the creation of a debt.

IX. The sum of our conclusion is that the scheme comprised in the act under consideration contravenes the Constitution on the grounds already stated. We reach this conclusion with a due sense of its great importance and of the public disappointment to result therefrom. We reach it, too, with great deference to the executive and legislative departments of the state, and with a quickened appreciation of the endless procession of great problems of government which press upon them from

every side. Far be it from us to put in their way any obstacle not legally obligatory upon us all.

To shatter, by judicial decision, the painstaking labor of years of these great departments carries to the onlooker an ungracious aspect. The responsibility thus facing us is one not of our seeking, nor of our liking, nor yet one which we would dare evade. We are assured, too, that, in the long event, the duty we owe, not only to the litigants, but to our co-ordinate departments of government, is to undertake frankly the judicial responsibility which litigation casts upon us, and to declare faithfully our judicial convictions therein. In such a case, our primary concern is, and must be, directed to the soundness of our conclusion, and not to its consequences. Consequences are inevitable in every litigation, and are commensurate with the magnitude thereof. They are not judicially made, nor can we make them less or more. It is not given to the judge to look to consequences for guide in decision. If he does so, he is looking for light where none is. Indeed, he has thereby entered a dark room, and becomes as one groping, with his fingers upon the wall. The judge cannot know, if he would, the ultimate consequences of his decision. If the decision be truly sound, he may safely dare to trust the sequence of future events, early or late, to justify it.

To no one would we more willingly trust the ultimate justification of the decision herein than to the distinguished head of our executive department. Nor less willing should we be to trust the same to the sincere and high-minded representatives of the people who comprise the legislative department. And these things we say only as a token of the great respect entertained by us for our co-ordinate departments, with whom we share the responsibilities of state government.

As we write these concluding words, there come before us the concluding words of Justice Story in his opinion in the celebrated case of *Trustees of Dartmouth College v. Woodward*, 4 Wheat. (U. S.) 518 (4 L. Ed. 629). These were written a century ago, when constitutions were young and unprecedented, and when their restraints first began to be felt and to be resented by restive enterprise. They depict with special aptitude the perplexities and motives of the judicial mind under the weight of great responsibility. Here they are:

"In pronouncing this judgment, it has not for one moment escaped me how delicate, difficult, and ungracious is the task devolved upon us. The predicament in which this court stands in relation to the nation at large is full of perplexities and embarrassments. It is called to decide on causes between citizens of different states, between a state and its citizens, and between different states. It stands, therefore, in the midst of jealousies and rivalries of conflicting parties, with the most momentous interests confided to its care. Under such circumstances, it never can have a motive to do more than its duty; and, I trust, it will always be found to possess firmness enough to do that. Under these impressions, I have pondered on the case before us with the most anxious deliberation. I entertain great respect for the legislature, whose acts are in question. I entertain no less respect for the enlightened tribunal whose decision we are called upon to review. In the examination, I have endeavored to keep my steps *super antiquas vias* of the law, under the guidance of authority and principle. It is not for judges to listen to the voice of persuasive eloquence or popular appeal. We have nothing to do but to pronounce the law as we find it; and having done this, our justification must be left to the impartial judgment of our country."

The judgment of the district court is reversed.—*Reversed.*

All the justices concur.

Justice Grimm, appointed since the submission, takes no part.