# IN THE SUPREME COURT OF IOWA

No. 20–1323

Submitted January 20, 2022—Filed June 24, 2022

**SITE A LANDOWNERS,**

    Appellant,

vs.

**SOUTH CENTRAL REGIONAL AIRPORT AGENCY, CITY OF PELLA,** and **CITY OF OSKALOOSA,**

    Appellees,

and

**MAHASKA COUNTY,**

    Appellant.

------

**CITY OF PELLA** and **CITY OF OSKALOOSA,**

    Appellees/Cross-Appellants,

vs.

**MAHASKA COUNTY,**

    Appellant/Cross-Appellee.

------

Appeals from the Iowa District Courts for Mahaska and Washington Counties, Crystal S. Cronk and Shawn Showers, Judges.

County appeals from an adverse grant of summary judgment in favor of two cities regarding the validity of an agreement between the cities and county to establish a regional airport authority; landowners at the site of the proposed airport appeal the district court's determination they lacked standing to challenge the agreement. **REVERSED AND REMANDED.**

McDonald, J., delivered the opinion of the court, in which all participating justices joined. Appel, J., filed a concurrence. Mansfield and McDermott, JJ., took no part in the consideration or decision of the case.

Tyler M. Smith (argued) of Smith Law Firm, PLC, Altoona, for appellant Site A Landowners.

Michael R. Reck (argued), Charles F. Becker, Kelsey J. Knowles, and Joseph H. Lubben of Belin McCormick, P.C., Des Moines, for appellant/cross-appellee Mahaska County.

Mark Weinhardt (argued) of the Weinhardt Law Firm, Des Moines, and Jason C. Palmer and Benjamin R. Erickson (until withdrawal) of Bradshaw, Fowler, Proctor & Fairgrave, P.C., Des Moines, for appellees/cross-appellants City of Pella and City of Oskaloosa.

Amy Beattie of Brick Gentry P.C., West Des Moines, and David T. Bower of Nyemaster Goode, P.C., Des Moines, for appellee South Central Regional Airport Agency.

**McDONALD, Justice.**

Two cities and a county signed an agreement to jointly create an airport authority that would build and operate a new regional airport. Landowners at the site of the proposed airport objected to the plan, and a newly-elected slate of county supervisors opposed to the project sought to extricate the county from the airport authority. The cities filed suit to enforce the county's obligations under the airport authority agreement. The landowners filed a separate suit against both the cities and the county to have the airport authority declared illegal and prevent their land from being acquired for the airport by eminent domain. The district court granted summary judgment in favor of the cities and against the county and landowners. This consolidated appeal follows.

I.

The complicated procedural history of this case begins a decade ago, but the material facts are not in dispute. In 2012, the cities of Oskaloosa and Pella (Cities) along with Mahaska County (County) entered into an agreement to create the South Central Regional Airport Agency (SCRAA). Oskaloosa is located in Mahaska County, while Pella is located in neighboring Marion County. Both cities currently operate their own municipal airports that have become inadequate for their communities' needs, so a new regional airport to be built and operated by the SCRAA and located in rural Mahaska County, midway between the Cities, was deemed the preferred solution.

The SCRAA was established pursuant to a joint powers agreement authorized by Iowa Code chapter 28E. That agreement is referred to throughout

this opinion as the "28E Agreement." Iowa Code chapter 28E allows state agencies (including local units of government) "to provide joint services and facilities with other agencies and to cooperate in other ways of mutual advantage." Iowa Code § 28E.1 (2017). The stated purpose of the 28E Agreement is to provide for the "joint acquisition, construction, equipping, use and operation" of the new regional airport. The SCRAA is governed by a six-member board of directors. Three members are appointed by Pella, two members are appointed by Oskaloosa, and one member is appointed by Mahaska County. Under the 28E Agreement, any costs to construct the airport that are not otherwise funded by the federal government are to be split evenly between the Cities. The County is not responsible for financing construction of the airport.

The Cities explicitly assert that the County's participation in the SCRAA is necessary for the success of the enterprise. This is because, according to the Cities, they lack the governmental powers necessary to build the airport on their own. The Cities state that to successfully build the airport, they must rely on the County's "regulatory and legislative authority over . . . zoning, road relocations, and issuing building permits," as well as the County's power of eminent domain over land in unincorporated Mahaska County where the airport is to be located. To that end, Article X, section 1 of the 28E Agreement allows the SCRAA to either "bring an action in eminent domain in its own name" or to "request a Party to bring such action, which the Party shall then do." Article XII, section 1 of the 28E Agreement requires each party to "cooperate in good faith" with the SCRAA board and the other parties and requires each party to "use its best efforts to

carry out the provisions" of the 28E Agreement. The same provision says the Cities and the County must work "in good faith to resolve road relocations which may be required."

In another key provision, Article XI of the 28E Agreement says that a party may not amend or terminate the Agreement without "the approval of the governing Boards of each Party." This means a party may not unilaterally withdraw from the SCRAA. Absent the consent of the Cities, the County must remain a party "for the life of the Airport Facility." Michael Schrock, Jr., Oskaloosa's city manager, testified that the parties' goal in drafting this provision was "to create a binding and long-lasting agreement that could withstand political changes within the communities." When asked, Schrock agreed that the parties' intent was to create an entity to govern the airport that would have "certainty and some binding nature for future governmental bodies." The Federal Aviation Administration (FAA) apparently required such certainty as to the long-term cohesiveness and viability of the SCRAA before it would consider funding the project. An FAA representative wrote to Schrock in 2013 that it was "not prudent" for the agency to fund an airport project unless it was "assured that the sponsor has the means and ability to see a project to completion."

Despite initially agreeing to the terms of the 28E Agreement, the County's participation in the SCRAA proved controversial among members of the public. In 2013, the County's board of supervisors passed a resolution that sought to strike the portion of Article X, section 1 of 28E Agreement that permits the SCRAA to either "bring an action in eminent domain in its own name or . . .

request a Party to bring such action, which the Party shall then do." The proposed amendment would still have allowed the SCRAA to acquire property by means other than eminent domain. After reviewing the proposed amendment, an FAA representative stated it was "unlikely that a new airport could be constructed without the use of eminent domain." Neither the city councils of Oskaloosa nor Pella approved of the amendment, so it was not incorporated into the 28E Agreement.

Also in 2013, the SCRAA board approved a site for the airport known as "Site A." Site A is located in unincorporated Mahaska County, northwest of the city of Oskaloosa. The site plan called for the airport's primary runway to extend through an existing road, 220th Street. A Mahaska County engineer wrote to the SCRAA board in 2013, stating the County would disconnect 220th Street to accommodate construction of the airport, pending favorable environmental reviews. A group of landowners at the proposed site formed an unincorporated nonprofit organization, known as "Site A Landowners" (Landowners), which opposed the airport project. The Landowners contended that Site A was located on "prime farmland" and argued the proposed airport site should be rejected on this basis. Despite this opposition, the SCRAA acquired a parcel of land within Site A using eminent domain in 2020.

A new slate of county supervisors who opposed the airport project and the County's involvement in the SCRAA took office in 2017. In January and again in June of 2017, the board of supervisors voted to amend the 28E Agreement to

remove the County as a party. Since neither Oskaloosa nor Pella agreed to the proposed amendments, they failed according to the terms of the 28E Agreement.

The Cities filed suit against the County in response to the County's attempts to withdraw from the 28E Agreement. The Cities' complaint sought declaratory judgment that the 28E Agreement was valid and enforceable and sought specific performance of the County's obligations under the Agreement. The County answered the Cities' claims and asserted various affirmative defenses, including that the County's entry into the 28E Agreement violated the Iowa Constitution. The County also brought a counterclaim alleging the Cities breached the 28E Agreement by requiring the County to close 220th Street. The County contended this violated the portion of the 28E Agreement that requires the Cities to "work with Mahaska County in good faith to resolve *road relocations*" since closing a street is different from relocating it. (Emphasis added.)

The district court granted the Cities' motion for summary judgment on its claims against the County. The court found the 28E Agreement was valid and binding on the County, and it held the Cities could pursue the remedies provided in the Agreement, including specific performance of the County's obligations. However, the district court denied the Cities' motion for summary judgment on the County's breach of contract counterclaim, finding that questions of fact made summary judgment inappropriate. The County appealed the Cities' summary judgment win to this court, but we denied the appeal as interlocutory since the counterclaim remained pending.

After the Cities' motion for summary judgment was granted and while the case was still pending in the district court, the Cities filed a motion for change of venue pursuant to Iowa Rule of Civil Procedure 1.801(1). That rule allows a party to request a change of venue if "the county where the case would be tried is a party, the motion is by an adverse party, the issue is triable by a jury, and a jury has been demanded." *Id.* Because the suit was being heard in the district court for Mahaska County, and because the County's counterclaim included a demand for a jury trial, the motion was granted and venue was transferred to Washington County.

After the change of venue, the Cities filed a second motion for summary judgment. The Cities sought a more definitive ruling on the prior order for specific performance against the County. The district court modified the prior order so that specific performance was granted only with respect to the portions of the 28E Agreement which the County was already found to have breached. The district court ordered the County to "abide by the amendment and termination provision of the 28E [A]greement" (meaning the County could not seek to unilaterally withdraw from the SCRAA) and to "allow its SCRAA representative [to] attend and participate in good faith in the SCRAA meetings as needed." The Cities also sought, for a second time, summary judgment on the County's breach of contract counterclaim. The district court denied summary judgment on the counterclaim, again finding that material issues of fact existed regarding the relocation of 220th Street.

The case proceeded to discovery. In 2020, the County asked the district court to reconsider its prior grant of summary judgment in favor of the Cities and declare the 28E Agreement void based on newly-raised legal arguments. The district court declined the County's request. The County and the Cities then jointly moved to dismiss the County's breach of contract counterclaim without prejudice in order to render the dispute final and appealable. The district court granted the joint motion and the County timely appealed the grants of summary judgment in favor of the Cities to this court.[1]

The Site A Landowners at first attempted to intervene in the lawsuit between the Cities and the County. The district court for Mahaska County denied the Landowners' motion to intervene, finding their interests were too speculative and could instead be adequately argued and protected by the County. After the case was transferred and the district court for Washington County granted the Cities' second motion for summary judgment against the County, the Landowners filed a separate lawsuit in Mahaska County that named both the Cities and the County as defendants. In their lawsuit, the Landowners sought a judgment declaring that the 28E Agreement was illegal and an injunction against the SCRAA to prevent it from acquiring land at Site A via eminent domain. While the County was nominally a defendant in the Landowners' lawsuit, it supported the Landowners' position and filed a cross-claim against the Cities, arguing the

---

[1]The Cities have nonetheless cross-appealed the district court's order denying summary judgment on the County's counterclaim for breach of contract. Our decision in this case makes it unnecessary to consider whether we have jurisdiction to consider the Cities' cross-appeal and whether the cross-appeal has merit.

28E Agreement was unconstitutional, ultra vires, an unlawful delegation of the County's powers, and in violation of public policy.

The parties submitted cross-motions for summary judgment in the Landowners lawsuit. The district court issued an omnibus ruling on these motions. First, the court held the Landowners lacked standing to bring the suit because, in the court's view, the decision whether to locate the airport at Site A had not been finalized. Accordingly, the court held the Landowners' injuries were too speculative to give them standing and granted the Cities' motion for summary judgment. Second, the district court held the earlier rulings granting summary judgment to the Cities in their lawsuit against the County were preclusive on the issue of the validity of the 28E Agreement. The court accordingly granted the Cities' motion for summary judgment on the County's cross-claim.

The Landowners asked the district court to reconsider its ruling, which the district court declined to do. The Landowners and County both timely appealed the district court's grant of summary judgment in favor of the Cities in the Landowners' lawsuit. The appeals in the Landowners' lawsuit were consolidated with the County's appeal in the Cities lawsuit, and we retained the consolidated appeal.

## II.

"Summary judgment is properly granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *McQuistion v. City of Clinton*, 872 N.W.2d 817, 822 (Iowa 2015). The parties agree that there are no material facts in dispute in this case. "Because the facts are

not in dispute, the question we must resolve is whether the district court correctly applied the law to the facts." *First State Bank v. Clark*, 635 N.W.2d 29, 30 (Iowa 2001). "[A] party faced with a motion for summary judgment can rely upon the district court to correctly apply the law and deny summary judgment when the moving party fails to establish it is entitled to judgment as a matter of law." *Otterberg v. Farm Bureau Mut. Ins.*, 696 N.W.2d 24, 27–28 (Iowa 2005).

We typically review summary judgment rulings for correction of legal error. *Little v. Davis*, 974 N.W.2d 70, 73 (Iowa 2022). In this case, some of the assignments of error also raise constitutional issues. "We review the legal issues necessary for resolution of the constitutional claims presented within the context of the summary judgment proceeding de novo." *Varnum v. Brien*, 763 N.W.2d 862, 874 (Iowa 2009).

## III.

In this case, the appellants raise both statutory and constitutional issues. "Ordinarily, we look to statutory issues first in order to avoid unnecessary constitutional questions." *Simmons v. State Pub. Def.*, 791 N.W.2d 69, 73–74 (Iowa 2010). Accordingly, we first consider whether the establishment of a joint airport authority in the manner the County and Cities did in this case violates the provisions of the Iowa Code related to county home rule and joint airport authorities.

In Iowa, "Counties or joint county-municipal corporation governments are granted home rule power and authority, not inconsistent with the laws of the general assembly, to determine their local affairs and government . . . ." Iowa

Const. art. III, § 39A. We have described the home rule power of counties as "broad":

> Under our form of government in Iowa, counties are empowered to perform any function to 'protect and preserve the rights, privileges, and property of the county or of its residents, and to preserve and improve the peace, safety, health, welfare, comfort, and convenience of its residents' except as limited by the constitution or a statute.

*Warren Cnty. Bd. of Health v. Warren Cnty. Bd. of Supervisors*, 654 N.W.2d 910, 913 (Iowa 2002) (quoting Iowa Code 331.301(1) (1999)). The legislature has set forth the various home rule powers and duties of county governments in chapter 331 of the Iowa Code. The home rule powers of each county are vested in a county board of supervisors. Iowa Code § 331.301(2). The "[p]owers and limitations relating to services" vested in each county's board of supervisors are listed in Iowa Code section 331.382. A county board of supervisors may exercise the powers specified in Iowa Code section 331.382 "in accordance with the sections designated, and may exercise these *or similar powers* under its home rule powers or other provisions of law." *Id.* § 331.382(1) (emphasis added).

Two specific powers related to airports are enumerated in section 331.382 of the Code. Counties are specially permitted to exercise their home rule powers to establish "an airport commission as provided in [chapter 330 of the Code]." *Id.* § 331.382(1)(*i*). Alternatively, a county may create "an airport authority as provided in chapter 330A [of the Code]." *Id.* § 331.382(1)(*j*).

Chapters 330 and 330A represent two distinct mechanisms for the joint creation of airport authorities by two or more units of local government. Under chapter 330, political subdivisions can establish a "joint airport commission." *Id.*

§ 330.4. A joint airport commission can only be created after a vote of the citizens of a political subdivision "as to whether the management and control of the airport shall be placed in an airport commission." *Id.* § 330.17(1). Should a majority of voters assent, the governing body of the municipality must appoint a three- or five-member commission to govern the airport. *Id.* §§ 330.17(1), .20. A joint airport commission can only be dissolved by another vote of the public. *Id.* § 330.17(2).

Chapter 330A is an alternative mechanism that allows local governments to jointly create an "airport authority." A local government may participate in the creation of an airport authority by first adopting a resolution and holding a public hearing on the matter. *Id.* § 330A.6. The governing board of the municipality can then enact an ordinance to create the airport authority. *Id.* While a municipality can create or join a chapter 330A authority without first holding a public vote, a municipality is also allowed to freely withdraw from an authority by again passing a resolution, holding a hearing, and enacting an ordinance on withdrawal. *Id.* § 330A.7. A chapter 330A airport authority must be governed by either a three- or five-member appointed board. *Id.* § 330A.5.

There is no question that the SCRAA was not established pursuant to either chapter 330 or chapter 330A. The County contends section 331.382 of the Code permits a county to participate in a joint airport project only if it complies with the provisions of either chapter 330 or chapter 330A. The Cities counter that chapters 330 and 330A represent two nonexclusive mechanisms for creating a joint airport authority and that nothing in the county home rule statute

prohibits a county from participating in some alternative form of joint airport authority. To resolve this question, we must interpret the various statutes at play. Statutory interpretation "begins with the language of the statute at issue." *State v. Doe*, 943 N.W.2d 608, 610 (Iowa 2020). "Using traditional interpretive tools, we seek to determine the ordinary and fair meaning of the statutory language at issue." *Id.* "In determining the ordinary and fair meaning of the statutory language at issue, we take into consideration the language's relationship to other provisions of the same statute and other provisions of related statutes." *Id.*

First, we must determine whether anything in the text of Iowa Code chapter 331 (the chapter regarding county home rule) prohibits a county from participating in a joint airport authority formed in some manner other than chapters 330 or 330A. We hold that it does not. Iowa Code section 331.382 lists specific powers a county "*may exercise*" but allows a county to "exercise these *or similar powers* under its home rule powers or other provisions of law." Iowa Code § 331.382(1) (emphases added). This language unambiguously indicates that the powers related to airports in section 331.382 are nonexclusive. While a county *may* establish a joint airport authority under either chapters 330 or 330A, it may also exercise "similar powers under its home rule powers or other provisions of law." *Id.* There is no doubt that creating an airport is part of a county's general home rule powers, and the parties do not contend otherwise. *See id.* § 331.301(1), (4) (permitting a county to "exercise any power and perform any function" so long as doing so is not "irreconcilable with . . . state law"). And

counties are further permitted to exercise their powers "jointly with other political subdivisions . . . in accordance with chapter 28E." *Id.* § 331.304(1). No provision in chapter 331 makes chapters 330 and 330A the exclusive mechanisms for a county to form a joint airport authority with other local governments.

Next, we must determine whether anything in the text of Iowa Code chapters 330 or 330A makes those chapters the exclusive mechanisms whereby a county may participate in a joint airport authority. We again hold that neither chapter includes such a restriction. As to chapter 330, the County points to language stating that political subdivisions "may provide for the creation and establishment of a joint airport commission which, when so created or established, shall function in accordance with the provisions" of chapter 330. *Id.* § 330.4. We interpret this language to mean that *if* a county chooses to create a joint airport commission, *then* it must comply with the provisions of chapter 330. It does not suggest that a chapter 330 joint airport commission is the *only* mechanism for the joint creation of an airport by a county. The plain language of chapter 330 does not preempt or prohibit a county from creating a joint airport authority in some other form.

With respect to chapter 330A, the County argues that the following language requires that any joint airport authority other than a joint airport commission created pursuant to chapter 330 must comply with the provisions of chapter 330A:

The powers conferred by this chapter shall be in addition and supplemental to any other law and this chapter shall not be construed so as to repeal any other law, except to the extent of any conflict between the provisions of this chapter and the provisions of any other law, in which event the provisions of this chapter shall be controlling and shall, to the extent of any such conflict, supersede the provisions of any other law. This chapter is intended to and shall provide **an alternative and complete method for the exercise of the powers granted by this chapter** . . . .

*Id.* § 330A.17 (emphasis added). We disagree with the County's reading of the statute. Chapter 330A is "an alternative and complete method for the exercise of the powers" to establish a joint airport authority. *Id.* "The pertinent dictionary definition of 'alternative' is '[a]llowing or necessitating a choice between two or more things.'" *Clean Wis., Inc. v. Pub. Serv. Comm'n of Wis.*, 700 N.W.2d 768, 802 (Wis. 2005) (alteration in original) (quoting *The American Heritage Dictionary of the English Language* 55 (3d ed. 1992)). Applying this ordinary definition of the word "alternative," we interpret chapter 330A to be one method a county may choose to utilize in creating or establishing a joint airport authority, not the exclusive mechanism for doing so. The plain language of chapter 330A explicitly does not prevent a municipality from establishing a joint airport authority in some other form, including pursuant to an otherwise valid agreement under chapter 28E.

The County argues that a 28E agreement "must be tethered to, and bound by, an underlying substantive statute." (Emphasis omitted). The County asserts that allowing local governments to establish airports pursuant to 28E agreements in a manner other than as prescribed in chapters 330 or 330A would constitute a "blank check" and permit municipalities to ignore underlying

statutory restrictions on their powers. The County points for support to this court's decision in *Barnes v. Department of Housing & Urban Development*, 341 N.W.2d 766 (Iowa 1983). *Barnes* concerned a housing authority in the City of Hampton formed jointly with other local governments under chapter 28E that sought to build a low-income housing project. *Id.* at 766–67. Pursuant to statute, a municipality or a housing authority could not build a housing project unless it first received "majority approval from the local governing body." *Id.* at 767 (quoting Iowa Code § 403A.5 (1983)). The housing authority contended that the City of Hampton had delegated its power to approve housing projects to the housing authority as part of the 28E agreement that created the authority. *Id.* at 768. We rejected this argument, holding that since the city itself lacked the power to proceed with a housing project absent approval of its city council, it could not delegate that power to a housing authority created pursuant to chapter 28E. *Id.* As we stated, no "independent powers aris[e] under Chapter 28E" because a chapter 28E entity is "a joint exercise of powers already vested in the members." *Id.*

*Barnes* does not support the County's assertion. It is true that chapter 28E allows for the joint exercise of powers "already vested" in the cooperating entities and does not confer additional powers on those entities. *Id.*; *see Goreham v. Des Moines Metro. Area Solid Waste Agency*, 179 N.W.2d 449, 455–56 (Iowa 1970). However, counties already possess the power to establish airports under their home rule authority. *See* Iowa Code § 331.301(1), (4). Since counties possess the authority to establish airports, they may also exercise that

power jointly with other entities pursuant to a 28E agreement. *See id.* § 331.304(1). While any such joint airport authority must adhere to various constitutional strictures (as we discuss in the next part of this opinion), there is nothing in the statute forbidding a county from entering into a 28E agreement with other municipalities to create a joint airport authority. This is true even if the county does so outside the requirements of chapters 330 or 330A.

IV.

We next address the County's arguments attacking the constitutionality of the County's entry into the 28E Agreement. The County raises several constitutional bases to invalidate the 28E Agreement, but we find two of its contentions to be dispositive. First, we agree with the County that the 28E Agreement unlawfully binds the County's board of supervisors to the decisions of an earlier-elected board regarding the exercise of governmental functions. Second, we agree that the 28E Agreement unlawfully restricts the County from terminating its delegation of powers to the SCRAA. The Landowners raise similar challenges, and they further assert that the 28E Agreement is constitutionally infirm because it lasts for an indefinite term and because it violates the Landowners' right to equal protection of laws. Because we find the issues raised by the County are dispositive of both appeals, we need not consider these additional arguments raised by the Landowners.[2]

A.

---

[2]The issue of the Landowners' standing to challenge the 28E Agreement was also raised and decided in the district court, but we likewise need not address it here.

Article XI of the 28E Agreement prohibits any amendment or termination of the Agreement without the unanimous consent of all parties. The effect of this provision is that the County is inextricably bound to the SCRAA for the life of the agency and is bound by the 28E Agreement to exercise its legislative functions (such as its powers over zoning, road relocations, eminent domain, and issuing building permits) for an indefinite period, even if a new slate of supervisors is elected in the interim. We agree with the County that this results in one board of supervisors unconstitutionally binding a future board of supervisors in its exercise of legislative powers.

"[I]n legislative matters a municipality may not bind its successors." *Neuzil v. City of Iowa City*, 451 N.W.2d 159, 165 (Iowa 1990). We have previously explained the rationale for this rule:

> The members of its legislative body are trustees for the public, and the nature and limited tenure of their office impress the ordinances enacted by them with liability to change. One council may not by an ordinance bind itself or its successors so as to prevent free legislation in matters of municipal government.

*Hanna v. Rathje*, 171 N.W.2d 876, 880 (Iowa 1969) (quoting Eugene McQuillin, *The Law of Municipal Corporations* § 21.10 (1969)). We have stated this is a constitutional rule: the legislature derives its power from article III, section 1 of the Iowa Constitution, and the power of a legislative body to exercise its legislative functions cannot be abridged by either another branch of government or by an earlier-elected body of the same branch. *See Bd. of Ed. In & For Del. Cnty. v. Bremen Twp. Rural Indep. Sch. Dist. of Del. Cnty.*, 148 N.W.2d 419, 424 (Iowa 1967); *Iowa-Neb. Light & Power Co. v. City of Villisca*, 261 N.W. 423, 429

(Iowa 1935); *State v. Exec. Council of Iowa*, 223 N.W. 737, 740 (Iowa 1929); *State v. Platner*, 43 Iowa 140, 141 (1876). This rule applies to the general assembly and "to boards or other groups properly delegated legislative authority," including a county board of supervisors. *Bd. of Ed. in & For Del. Cnty.*, 148 N.W.2d at 424; *see Marco Dev. Corp. v. City of Cedar Falls*, 473 N.W.2d 41, 44 (Iowa 1991) ("[A]uthority to bind successive legislative bodies could not be granted by the legislature, which itself is prohibited from doing so."); Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 206 (1st ed. 1868) ("Equally incumbent upon the State legislature and these municipal bodies is the restriction that they shall adopt no irrepealable legislation. No legislative body can so part with its powers by any proceeding as not to be able to continue the exercise of them.").

The rule against one legislative body binding successive legislative bodies is concerned with "governmental" as opposed to "proprietary" functions. *Marco Dev. Corp.*, 473 N.W.2d at 42; *see Iowa-Neb. Light & Power Co.*, 261 N.W. at 429 ("[I]n the instant case there is no *constitutional provision* prohibiting the Legislature from empowering one city council from making a contract binding upon future councils."). The precise contours of each function may require elucidation in a particular case. *See Marco Dev. Corp.*, 473 N.W.2d at 43 (stating the distinction between governmental and proprietary functions is "often difficult" because there are "municipal activities which possess features of both"); *see also Jayhawk Racing Props., LLC v. City of Topeka*, 484 P.3d 250, 259–60

(Kan. 2021) (Stegall, J, concurring) (discussing difficulties in applying the governmental-proprietary distinction). However, our precedents make clear that the municipal activities at issue in this dispute—decisions over zoning, road relocations, eminent domain, and issuing building permits—are unambiguously core governmental functions, not merely proprietary functions. *Residential & Agric. Advisory Comm., LLC v. Dyersville City Council*, 888 N.W.2d 24, 40 (Iowa 2016) ("[Z]oning determinations are a legislative function of a city council or board of supervisors."); *Oakes Constr. Co. v. City of Iowa City*, 304 N.W.2d 797, 808 (Iowa 1981) (en banc) ("[C]ounty supervisors have broad discretion of a legislative nature to determine whether a street or road shall or shall not be established, initially or by extension . . . ."); *Ermels v. City of Webster City*, 71 N.W.2d 911, 913 (Iowa 1955) ("The question whether a municipal airport should be enlarged by the taking of private property by eminent domain was a matter for the exclusive determination of the City Council in its legislative capacity . . . ."); *Rehmann v. City of Des Moines*, 215 N.W. 957, 959 (Iowa 1927) ("The exercise of the power to grant or refuse the license to erect a building was a governmental function." (quoting *Clinard v. City of Winston–Salem*, 91 S.E. 1039, 1040 (N.C. 1917))).

By entering into the 28E Agreement in 2012, the Mahaska County Board of Supervisors bound future boards to a particular course of legislative action in violation of the Iowa Constitution. Specifically, Article X, section 1 of the 28E Agreement allows the SCRAA to either "bring an action in eminent domain in its own name" or to "request a Party to bring" an eminent domain action, "which

the Party shall then do." Article XII, section 1 requires the County and Cities to work "in good faith to resolve road relocations which may be required" and requires each party to "use its best efforts to carry out the provisions" of the 28E Agreement. Thus, to remain in compliance with the 28E Agreement, the County must cede or subserve its legislative decision-making to the SCRAA. Since the County cannot amend or terminate the 28E Agreement without the consent of both Cities, it is functionally bound to adhere to this cession of its core legislative functions for an indefinite period. The actions of an earlier-elected board of supervisors bound a later-elected board so as to prevent the later-elected board in the free exercise of its governmental functions. We hold such actions by the earlier-elected board violated the Iowa Constitution.

The Cities contend the 28E Agreement does not unconstitutionally bind later-elected boards of supervisors but merely "delegates" the authority to "change outcomes or undo decisions" regarding the exercise of core governmental functions to the SCRAA itself. The Cities point to Iowa Code section 28E.7, which says that while nothing in chapter 28E "shall relieve any public agency of any obligation or responsibility imposed upon it by law," such obligations or responsibilities can be performed by a chapter 28E joint entity rather than by the public agency itself. Under the Cities' interpretation, section 28E.7 allows the County to delegate to the SCRAA the ability to undo an earlier action by the county board of supervisors. The Cities also point to Iowa Code section 28E.14, which states, "Any contract or agreement authorized by [chapter 28E] shall not be limited as to period of existence, except as may be

limited by the agreement or contract itself." According to the Cities, this provision allows local governments to enter into 28E agreements of unlimited duration, including agreements to delegate governmental functions. This allows 28E entities to be "durable," according to the Cities.

The Cities' arguments are unpersuasive. The rule that one county board of supervisors cannot bind a later board in the exercise of its governmental functions is a constitutional one. It is axiomatic that the legislature cannot pass a statute to override a constitutional command. *See, e.g., Carroll v. City of Cedar Falls*, 261 N.W. 652, 654 (Iowa 1935) ("The Legislature is not prevented from adopting any law it sees fit, *unless it is clearly prohibited by some plain provision of the Constitution.*" (emphasis added)). The Cities' contention that the Mahaska County Board of Supervisors can simply delegate to a regional airport authority its core governmental functions and its power to undo that delegation is contrary to our constitutional order. It still deprives a later-elected board of the ability to change or undo those earlier decisions. Even if the Cities' strained interpretation of chapter 28E did authorize such an extensive delegation of governmental power, the statute cannot overcome the constitutional rule prohibiting earlier legislatures from binding later-elected legislatures.

Taken to its logical conclusion, the Cities' interpretation of chapter 28E would allow any county to enter into a 28E agreement to permanently delegate its governmental functions (and its ability to undo that earlier delegation) to another county. In fact, the Cities conceded this very point during oral argument in this case. This view would render the voters of Mahaska County like

permanent passengers aboard RMS *Titanic*, without the ability to steer their ship around new obstacles as they arise. The better view, advanced by appellants, is that the voters of the County, through their elected board of supervisors, are captains of their own ship, not bound permanently to a particular course by an earlier vote of their county supervisors.

### B.

The County's entry into the 28E Agreement was also unlawful for a related reason: because Article XI of the Agreement prevents the County from exiting the SCRAA in the same manner as it entered, it unlawfully restricts the County's ability to end its delegation of powers to the SCRAA. In this case, the County entered the 28E Agreement and agreed to participate in the SCRAA after a majority vote of its board of supervisors. But as noted, the process for terminating the 28E Agreement and withdrawing from the SCRAA is far more onerous since it requires the consent of both Cities. The County argues this violates our precedent regarding delegation of a municipality's legislative power, and we agree.

In this case, the County delegated to the SCRAA several governmental powers, including those over zoning, road relocations, eminent domain, and issuing building permits. The parties have argued about the extent to which each of these delegations was lawful, but we need not reach that question because if a local government delegates its governmental functions to another entity, it must be "free to revoke or change [the] delegation of power," and this revocation or change "must be done by the same type of procedures that created the

delegation." *Warren Cnty. Bd. of Health*, 654 N.W.2d at 915; *see also GTE Int'l Inc. v. Hunter*, 649 F. Supp. 139, 147 (D.P.R. 1986) (stating an agency may delegate its powers via regulation and "is free to change its regulations with the proper procedures if it wishes to do so"). The County is not able to revoke its delegation of powers in this case by the same procedures that created the delegation because a majority vote of the board of supervisors is insufficient to effect the revocation. The 28E Agreement is therefore unlawful to the extent it does not include symmetrical procedures to delegate and revoke the delegation of the County's governmental powers.

## C.

"A fundamental requirement for the enforcement of a municipal contract is that the municipality must have exercised its authority to enter into the contract within the scope of the powers conferred by statute. If a municipality fails to appropriately exercise its authority or comply with statutory procedures, the contract is void." *Miller v. Marshall Cnty.*, 641 N.W.2d 742, 750–51 (Iowa 2002) (citations omitted); *see City of Humboldt v. Knight*, 120 N.W.2d 457, 460 (Iowa 1963). We hold that Mahaska County exceeded its constitutional authority by entering into the 28E Agreement to the extent the Agreement binds future boards of supervisors in the free exercise of their governmental powers and to the extent it prevents the County from terminating its participation in the SCRAA in the same manner as it commenced participation. The district court erred in granting the Cities' motion for summary judgment and declaring the 28E

Agreement to be valid and ordering specific performance by the County of its obligations under the 28E Agreement.

## V.

We must determine the proper remedy. In this case, both of the constitutional infirmities that we have identified stem from Article XI of the 28E Agreement, which prohibits the County from amending or terminating the Agreement without the unanimous consent of the Cities. Article XV of the 28E Agreement includes a severability provision, stating that if a court holds any provision of the Agreement to be invalid, the invalid provision "shall not affect the other provisions of [the] Agreement which can be given effect without the provision determined to be invalid." The severability of contractual provisions "depends on the parties' intent," which is "determined 'from the language the parties have used and the subject matter of the contract.'" *Equity Control Assocs., Ltd. v. Root*, 638 N.W.2d 664, 671 (Iowa 2001) (quoting *In re Est. of Claussen*, 482 N.W.2d 381, 383 (Iowa 1992)). The severability provision in the 28E Agreement plainly indicates the parties intended that any invalid portion of the Agreement be severed from the remainder of the Agreement. There is no reason in this case that this severability provision should not be given effect, or that it does not specifically permit severance of Article XI of the Agreement. We therefore declare that Article XI of the 28E Agreement is invalid and sever it from the remainder of the Agreement. Mahaska County may, consistent with this opinion, choose to withdraw from the 28E Agreement by a valid vote of its board of supervisors.

## VI.

For the foregoing reasons, we reverse the district court's grant of summary judgment in favor of the cities of Pella and Oskaloosa and remand this matter for entry of judgment consistent with this opinion.

**REVERSED AND REMANDED.**

All participating justices join this opinion. Appel, J., files a concurrence. Mansfield and McDermott, JJ., take no part.

#20–1323, *Site A Landowners v. S. Cent. Reg'l Airport Agency*

**APPEL, Justice (concurrence).**

I concur in the majority opinion. I write separately to emphasize that nothing in the majority opinion addresses the important question of whether a municipality or local government entity may delegate its regulatory or eminent domain power to a third party.